# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERIC MARCH, DINA MARCH,<br>        *Plaintiffs*,<br><br>        v.<br><br>UNITED STATES OF AMERICA,<br>        *Defendant*. | No. 3:17-cv-2028 (VAB) |

## MEMORANDUM AND ORDER

Eric March has sued the United States of America (the "United States" or "Defendant"),
alleging that Drs. Robert Franklin Berke Schlessel and Marko Lujic of the Veterans
Administration Hospital in West Haven, Connecticut (the "VA") committed medical malpractice
during a June 2015 laparoscopic ventral hernia repair procedure performed on him. Complaint,
ECF No. 1 (Dec. 6, 2017). Mr. March's wife, Dina March (collectively with Mr. March, the
"Plaintiffs"), also has brought a loss of consortium claim against the United States, *Id.* at 6-7.

Following a four-day bench trial, the Court now sets forth its findings of fact and
conclusions of law under Federal Rule of Civil Procedure 52(a)(1).[1] Fed. R. Civ. P. 52(a)(1).

As explained below, the Court **DENIES** Defendant's motion *in limine*, ECF No. 48,
**ORDERS** judgment in favor of Plaintiffs, and **AWARDS $3,270,278.22** in economic damages
to Mr. March; **$5,000,000** in noneconomic damages to Mr. March; and **$1,200,000** in damages
for loss of consortium to Mrs. March, for a total award of **$9,470,278.22**.

---

[1] Federal Rule of Civil Procedure 52(a)(1) provides:

> In an action tried on the facts without a jury or with an advisory jury, the court
> must find the facts specifically and state its conclusions of law separately. The
> findings and conclusions may be stated on the record after the close of the
> evidence or may appear in an opinion or a memorandum of decision filed by the
> court. Judgment must be entered under Rule 58.

## I.     PROCEDURAL HISTORY

On December 6, 2017, Mr. and Mrs. March sued Defendant. Compl. Mr. March has

alleged that "[w]hile under the care, treatment, monitoring, diagnosing and supervision" of the

VA, *id*. ¶ 8, he "suffered severe, serious, painful and permanent injuries," *id*., which "were

caused by the failure of [Defendant] . . . to exercise reasonable care," *id*. ¶ 9, and resulted in him

being "permanently deprived of his ability to carry on and enjoy life's activities and his earning

capacity . . . [being] permanently destroyed," *id*. ¶ 11. Mrs. March has alleged that "[a]s a result

of the aforesaid occurrences to [Mr. March]," she was "deprived of the companionship and

society of her husband all to her damage." *Id*. ¶ 12.

On March 28, 2018, Defendant filed an Answer to the Complaint. Answer, ECF No. 13

(Mar. 28, 2018).

On September 25, 2020, the parties filed a joint trial memorandum. Joint Final Pretrial

Mem., ECF No. 47 (Sept. 25, 2020) ("JTM"). The joint trial memorandum included as exhibits

the parties' proposed findings of fact and conclusions of law. Pls.' Proposed Statement of Facts

and Conclusions of Law, ECF No. 47-3 (Sept. 25, 2020); Def.'s Proposed Statement of Facts and

Conclusions of Law, ECF No. 47-4 (Sept. 25, 2020).

That same day, Defendant filed a motion *in limine* to preclude and/or limit the testimony

of Mr. March's treating primary-care physicians, Dr. Remi Matthews and Dr. Matthew

Waddington, and Plaintiffs' proffered expert witness, Darlene Carruthers. Def.'s Mot. *in Lim*. to

Limit the Testimony of Pl.'s Treating Physicians Pursuant to Fed. R. Civ. P. 26(a)(2)(C) and

Mem. in Supp., ECF No. 48 (Sept. 25, 2020) ("Mot. *in Lim*.").

On October 5, 2020, Plaintiffs objected to the motion *in limine*. Pls.' Obj. to Def.'s Mot.

in Lim., ECF No. 50 (Oct. 5, 2020) ("Obj. to Mot. *in Lim*.").

On October 10, 2020, Defendant replied to Plaintiffs' objection to the motion *in limine*. Reply in Supp. of Mot. *in Lim.*, ECF No. 54 (Oct. 10, 2020) ("Reply to Mot. *in Lim.*").

From October 19, 2020 to October 22, 2020, the Court held a bench trial. *See* Min. Entries, ECF Nos. 57, 58, 59, 61. During the trial, nine witnesses testified: Dr. Maher Suede, a treating physician of Mr. March who was tendered as an expert treating witness, Tr. of Proceedings, ECF Nos. 65 66, 67, 68 (collectively, "Tr.") 3:14-15, 39:4-14; Dr. Lujic, who participated in Mr. March's laparoscopic ventral hernia repair procedure and was tendered as an expert treating witness, *id.* 74:10-15, 78:4-7; Dr. Schlessel, who participated in Mr. March's laparoscopic ventral hernia repair procedure and was tendered as an expert treating witnesses, *id.* 157:3-4, 159:18-25; Mr. March, *id.* at 263:14-15; Mrs. March, *id.* 343:13; Dr. Stephen Smith, a non-treating physician offered by Plaintiffs as an expert witness, *id.* 361:8-9, 395:3-11; Dr. Yuri Novitsky, a non-treating physician offered by Defendant as an expert witness, *id.* 478:8-9, 480:2-5; Darlene Carruthers, a life care planner offered by Plaintiffs as an expert witness, *id.* 605:16-17, 606:16-18; 609:11-22; and Dr. Gary Crakes, an economist offered by Plaintiffs as an expert witness, *id.* 671:5-6, 672:22-675:17. Twenty-five exhibits were admitted in full, with seven exhibits admitted for identification. *Id.* 2:22-3:5; 294:7-10; 300:15-18; 306:24-307:2; 307:17-20; 312:8-12; 313:11-15; 314:18-22; 354:6-9; 473:24-25; *see also* Revised Pl.'s Exhibit List, ECF No. 80 (Jan. 15, 2020) ("Exhibit List").

On December 4, 2020, the parties filed revised proposed findings of fact and conclusions of law. Pls.' Proposed Statement of Facts and Conclusions of Law, ECF No. 69 (Dec. 4, 2020) ("Pls.' Post-Trial Findings"); Def.'s Post-Trial Proposed Findings of Fact and Conclusions of Law, ECF No. 70 (Dec. 4, 2020) ("Def.'s Post-Trial Findings")

On December 18, 2020, the parties filed responses to the proposed findings of fact and conclusions of law. Def.'s Resp. to Pls.' Post-Trial Filing (ECF No. 69), ECF No. 71 (Dec. 18, 2020) ("Def.'s Reply"); Pls.' Reply to Def.'s Post-Trial Proposed Findings of Fact and Conclusions of Law, ECF No. 72 (Dec. 18, 2020) ("Pls.' Reply").

On January 7, 2021, the Court held oral argument by videoconference on the proposed findings of fact and conclusions of law. *See* Min. Entry, ECF No. 74 (Jan. 7, 2021). At oral argument, counsel for Plaintiffs represented that she would file a supplemental memorandum providing caselaw in support of their request for noneconomic damages. *Id.*

That same day, the Court ordered the parties to meet and confer to address discrepancies in the exhibit list and to provide an updated exhibit list. Order, ECF No. 75 (Jan. 7, 2021).

Also, on that same day, Plaintiffs filed the post-trial submission discussed at oral argument. Pls.' Suppl. Post-Trial Submission, ECF No. 76 (Jan. 7, 2021) ("Pls.' Suppl. Mem.").

On January 14, 2021, Defendant filed a response to the Plaintiffs' supplemental memorandum on noneconomic damages. Def.'s Resp. to Pls.' Suppl. Post-Trial Filing (ECF No. 76), ECF No. 77 (Jan. 14, 2021) ("Def.'s Resp. to Pls.' Suppl. Mem.").

That same day, Defendant moved for leave to file a sur-reply to Plaintiffs' reply to Defendant's post-trial proposed findings of fact and conclusions of law and filed a proposed sur-reply. Def.'s Mot. to File a Sur-Reply to ECF No. 72 and Proposed Sur-Reply, ECF No. 78 (Jan. 14, 2021) ("Def.'s Sur-Reply"). On January 15, 2021, the Court granted Defendant's motion and permitted Plaintiffs until January 22, 2021 to file a response to Defendant's sur-reply. Order, ECF No. 79 (Jan. 15, 2021).

Also on January 15, 2021, Plaintiffs filed an updated Exhibit List.[2] Exhibit List.

---

[2] The revised Exhibit List was provided by Plaintiffs, and Defendant has not objected to its contents. *See* Exhibit List.

On January 22, 2021, Plaintiffs responded to Defendant's sur-reply to their supplemental memorandum. Pls.' Suppl. Post-Trial Submission, ECF No. 81 (Jan. 22, 2021) ("Pls.' Resp. to Def.'s Sur-Reply").

## II.   PRELIMINARY MATTERS

The Court first addresses Defendant's pending motion *in limine*, which seeks to preclude Drs. Matthews and Waddington from providing testimony as to anything beyond their scope of treatment or the reasonable reading of the medical records. Def.'s Reply to Mot. *in Lim.* at 1. While the motion itself does not explicitly request relief with respect to Ms. Carruthers' testimony, Defendant also argues on reply that the Court "has sufficient information at this time to preclude M[s]. Carruthers from testifying that Drs. Matthews and Waddington reviewed her life care plan and agreed with it."[3] *Id.* at 2. Defendant also argues that Ms. Carruthers, "a certified life care planner without a medical degree," may not be qualified to judge the accuracy and reliability of the out-of-court statements of physicians, and that she is only "parrot[ing]" rather than "critically evaluating" their findings. *Id.* at 4 (emphasis omitted).

As Drs. Matthews and Waddington did not testify, the Court addresses the motion only with respect to Ms. Carruthers's testimony.

### A.  Standard of Review

Motions *in limine* provide district courts the opportunity to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008).

---

[3] The Court later discusses Ms. Carruthers's testimony, outside of the scope of the issues raised in the motion *in limine*, in this opinion.

A court should only exclude evidence on motions *in limine* if the evidence is "clearly inadmissible on all potential grounds." *Levinson v. Westport Nat'l Bank*, No. 09-cv-1955, 2013 WL 3280013, at *3 (D. Conn. June 27, 2013). Courts also retain discretion to reserve judgment on some or all motions *in limine* until trial so that the motions are placed in the appropriate factual context. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996).

In a bench trial, there is no "concern for juror confusion or potential prejudice," as the court is the trier of fact. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 457 n.1 (S.D.N.Y. 2007). The court therefore has even greater discretion in bench trials than in jury trials to deny motions *in limine* and revisit admissibility determinations during or after trial. *See Serby v. First Alert, Inc.*, No. 09-cv-4229 (WFK) (VMS), 2015 WL 4494827, at *1 (E.D.N.Y. July 22, 2015) (citing *Tiffany*, 576 F. Supp. 2d at 457 n.1); *Lehman Bros. Holdings, Inc. v. United States*, No. 10 Civ. 6200 (RMB), 2014 WL 715525, at *2 (S.D.N.Y. Feb. 24, 2014) ("The Government will have the opportunity to object to any Experts' testimony in its post-trial Findings of Fact and Conclusions of Law, and the Court reserves its discretion to strike such testimony on any applicable grounds.").

### B. Discussion

Rule 703 provides that

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703; *see also Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 207 (D. Conn. 2014)

(discussing, in the context of admitting the testimony of a life care planner, that "[u]nder Rule

703, an expert may rely on inadmissible information if 'experts in the particular field [of the

witness] would reasonably rely on those kinds of facts or data in forming an opinion on the

subject.'" (quoting Fed. R. Evid. 703)).

Defendant argues that the Court "has sufficient information at this time to preclude M[s.]

Carruthers," a life-care planner who provided a future plan of care for Mr. March, based, in part,

on her consultation with Drs. Matthews and Waddington, "from testifying that Drs. Matthews

and Waddington reviewed her life care plan and agreed with it." Def.'s Reply to Mot. *in Lim.* at

2. In Defendant's view, Federal Rule of Evidence 703 "prohibits [Ms.] Carruthers from testifying

about what the doctors said about their review of (*e.g.*, their agreement with) her opinion," and

that she may not "simply transmit that hearsay to the jury." *Id.* at 3. Defendant also argues that

Ms. Carruthers, "a certified life care planner without a medical degree," may not be qualified to

judge the accuracy and reliability of the out-of-court statements of physicians, and that she is

only "parrot[ing]" rather than "critically evaluating" their findings. *Id.* at 4.

Plaintiffs argue that Rule 703 permits Ms. Carruthers to testify to her opinions "provided

the facts or data relied on is standard in the field," Pls.' Obj. to Mot. *in Lim.* at 5, and note that

Ms. Carruthers is a member of the International Academy of Life Care Planners, which

"promulgates standards for its members' work," *id.* at 6. Plaintiffs argue further that there is no

prejudicial effect to allowing Ms. Carruthers to testify that she consulted with Dr. Waddington

and Dr. Matthews as part of her standard assessment, particularly given that this is a bench trial,

*id.* at 6-7, and that Defendant could at trial cross-examine Ms. Carruthers as to her qualifications

and procedures, *id.* at 7.

The Court agrees.

The threshold question is whether experts in Ms. Carruthers's field "would reasonably rely on those kinds of facts or data in forming an opinion on the subject," or, specifically, whether other life-care planners like Ms. Carruthers would reasonably consult with a party's treating physicians in forming their future care plans and ask those physicians to review their report. *See Munn*, 24 F. Supp. 3d at 207. At trial, Ms. Carruthers credibly testified that in preparing a life care plan, the "standard of practice . . . includes a thorough and complete analysis of medical records, speaking with and meeting the client and obtaining input, and ultimately a review of the report by treating physicians." Tr. 607:8-13. Ms. Carruthers testified that the "standards of practice or protocols [she] . . . follow[s] in development of a life care plan" are promulgated by the International Academy of Life Care Planners, of which she is a fellow and member of the standards and compliance review board. *Id.* 608:15-609:4. As Ms. Carruthers testified, she "follow[ed] those standards with respect to [her] preparation of the life care [plan] in this case." *Id.* 609:7-10.

Given this undisputed testimony as to Ms. Carruthers's standards of practice, the Court finds that experts in the life-care planning field would reasonably rely on conversations with their client's treating physicians, and those treating physicians would review such a report, in the normal course of preparing such a plan. *See* Fed. R. Evid. 703; *cf. Munn*, 24 F. Supp. 3d at 207-08 (upholding admission of testimony of a life care planner where defendant argued that the life care planner relied on inadmissible hearsay because he credited an expert who did not testify at trial); *see also id.* at 207 ("[The life care planner] certainly assumed that [the physician upon which he relied] was correct about Munn's deficits and formulated a treatment plan accordingly, but that is no different than the kinds of permissible assumptions experts make all the time.").

Indeed, courts in Connecticut and elsewhere have found the testimony of similarly-qualified life care planners admissible. *See, e.g.*, *Oram v. deCholnoky*, No. X05CV054005513S, 2008 WL 4984752, at *12 (Conn. Super. Ct. Nov. 3, 2008) ("Forman is an experienced life care planner. . . . He is certified in the field, and as a Fellow of the International Academy of Life Care Planners, he certifies other life care planners. . . . The court rejects the defendants' argument that Forman's evidence and testimony is inadmissible because he is not a medical doctor. Forman is clearly an experienced expert in what care is needed by a severely disabled person."); *Frometa v. Diaz-Diaz*, No. 07 Civ. 6372(HB), 2008 WL 4192501, at *3 (S.D.N.Y. Sept. 11, 2008) (finding admissible the testimony of a life care planner with a Certificate in Life Care Planning, and "[i]n light of [the planner's] experience and the evident research that he conducted and that is reflected in his life care plan, including extensive quotes from Plaintiff's medical records").

To the extent Defendant has "identified deficiencies with certain aspects of [Ms. Carruthers]'s methodology or conclusions," Defendant retained the ability to "establish that through vigorous cross examination" at trial. *Ruiz v. Minh Trucking, LLC*, No. SA-19-CV-01191-DAE, 2020 WL 6265084, at *3 (W.D. Tex. Oct. 23, 2020) (slip op.) (declining to limit the testimony of a life care planner who, *inter alia*, "clearly la[id] out her methodology, utilizing a methodology approved by the American Academy of Physician Life Care Planners"); *see also Lehman Bros. Holdings, Inc*., 2014 WL 715525, at *2 ("The Government will have the opportunity to object to any Experts' testimony in its post-trial Findings of Fact and Conclusions of Law, and the Court reserves its discretion to strike such testimony on any applicable grounds.").

Accordingly, Defendant's motion *in limine* is **DENIED**.

## III.     UNDISPUTED FINDINGS OF FACT AND CONCLUSIONS OF LAW[4]

The Court has jurisdiction over Plaintiffs' claims against the United States under 28

U.S.C. § 1346(b)(1). JTM ¶ 1.

Plaintiffs timely filed their administrative complaint with the Department of Health and

Human Services ("HHS"). *Id.* ¶ 6.

At all relevant times, the VA was operated by the United States. *Id.* ¶ 4. At all relevant

times, Dr. Schlessel was an employee of Defendant and worked at the VA. *Id.* ¶ 5.

From June 15, 2015 through June 20, 2015, Dr. Schlessel, his agents, and employees of

the VA undertook the care, treatment, diagnosing, monitoring and supervision of Mr. March. *Id.*

¶ 10. On June 15, 2015, Dr. Schlessel, an attending physician, and Dr. Lujic, a fourth-year

resident, performed a laparoscopic incisional/ventral hernia repair with mesh on Mr. March at

the VA. *Id.* ¶¶ 11-13. Both Dr. Schlessel and Dr. Lujic were agents of the VA at the time of the

surgery. *Id.* ¶ 14. On June 20, 2015, an independent contractor of the VA, Dr. Hulda Einarsdottir,

decided to discharge Mr. March from the hospital. *Id.* ¶ 15.

As to the applicable legal standards, the parties agree that Drs. Schlessel and Lujic owed

Mr. March a duty to provide medical services in accordance with the prevailing standard of care.

Pls.' Post-Trial Findings ¶ 10; Def.'s Reply at 1.

The parties further agree that this action is governed by Connecticut law, which provides

that

> [i]n any civil action to recover damages resulting from personal
> injury or wrongful death . . ., in which it is alleged that such injury
> or death resulted from the negligence of a health care provider, as
> defined in section 52-184b, the claimant shall have the burden of
> proving by a preponderance of the evidence that the alleged actions
> of the health care provider represented a breach of the prevailing
> professional standard of care for that health care provider. The

---

[4] Unless otherwise stated, the Court's findings are taken from the parties' Joint Trial Memorandum. *See* JTM.

> prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

Conn. Gen. Stat. § 52-184c(a); Pls.' Post-Trial Findings ¶ 10; Defs.' Reply at 1.

The parties further agree that, to prevail on a negligence action, "[t]he plaintiff must prove that any injury for which he seeks compensation from the defendant was caused by the defendant," and that "[n]egligence is a proximate cause of an injury if it was a substantial factor in bringing the injury about." Pls.' Post-Trial Findings ¶ 24; Def.'s Reply at 10. The parties agree that "[n]egligent conduct can be a proximate cause of an injury if it is not the only cause, or even the most significant cause of the injury, provided it contributes materially to the production of the injury, and thus is a substantial factor in bringing it about." Pls.' Post-Trial Findings ¶ 25; Def.'s Reply at 10.

## IV.   ADDITIONAL FINDINGS OF FACT

Consistent with Federal Rule of Civil Procedure 52(a)(1), the following Findings of Fact are based on the testimony and exhibits presented at trial and discusses only those issues considered "material to the resolution of the parties' claims." *Cliffstar Corp. v. Alpine Foods, LLC*, No. 09-CV-00690-JJM, 2016 WL 2640342, at *1 (W.D.N.Y. May 10, 2016) (citing *I.N.S. v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("[C]ourts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach.")). Moreover, "the distinction between law and fact is anything but clear-cut," and therefore, "for purposes of appellate review, the labels of fact and law assigned" should not be considered controlling. *Id.* (internal quotation marks and citations omitted).

### A. Events Prior to the Laparoscopic Ventral Hernia Repair Procedure

In 2002, Mr. and Mrs. March were married. Tr. 277:16-17.

Around 2006, Mr. March became aware that he had diverticulitis[5] after he experienced abdominal pain and visited a gastrointestinal doctor. *Id.* 279:11-20. From 2006 to 2011, Mr. March managed his condition by modifying his diet and increasing his water intake. *Id.* 280:6-9.

In 2011, Mr. March went to Manchester Memorial Hospital ("Manchester") with severe abdominal pain. *Id.* 280:14-19. There, Dr. Suede diagnosed Mr. March with a perforated diverticulitis and performed an operation. *Id.* 7:9-17, 278:23-279:3; 280:13-24. Specifically, Dr. Suede performed an exploratory laparotomy, a sigmoid resection – the removal of the diseased portion of the colon – a colostomy, and an appendectomy. *Id.* 8:3-6, 10:8-19. Dr. Suede removed approximately 90 percent of the diseased area. *Id.* 42:20-43:1.

In August 2012, Mr. March underwent a diagnostic colonoscopy. Trial Ex. 3 ("Ex. 3") at 586. The diagnostic test showed that Mr. March had "scattered diverticula through[]out the colon" and diagnosed him with "pancolonic diverticulosis."[6] *Id.*

On April 1, 2015, Mr. March visited a primary care physician to address hernias that had caused him pain. Trial Exhibit 2 ("Ex. 2") at 249. Mr. March reported that he had been "feeling down, depressed, or hopeless" for "more than half the days," *id.* at 253, and his primary care provider noted that Mr. March was "borderline on assessments" for anxiety and depression," and

---

[5] During his testimony, Mr. March stated he was not sure whether his 2006 diagnosis was "diverticulitis" or "diverticulosis." *See* Tr. 280:1-4. "Diverticulitis" was defined by Dr. Suede as "an infectious complication that happens in the . . . intestine," *id.* 7:21-23, and, as Dr. Suede explained, "patients will develop first diverticulosis, which are small air pockets around the colon, and one of the complications of this condition is diverticulitis," *id.* 7:23-8:1. The Court views the question of whether Mr. March's 2006 diagnosis was diverticulitis or diverticulosis to be immaterial to its judgment and refers to it as "diverticulitis" to avoid confusion.

[6] Plaintiffs do not address the 2011 procedure performed by Dr. Suede in either their proposed statement of material facts and conclusions of law or in their response to Defendant's filings.

12

scheduled a follow-up appointment for a potential prescription for medication or mental health consultation, *id.* at 250.

### B.  The Laparoscopic Ventral Hernia Repair Procedure

In 2015, VA doctors diagnosed Mr. March as having a ventral hernia, Pls.' Post-Trial Findings ¶ 2 (citing Ex. 2), and recommended a laparoscopic ventral hernia repair procedure to treat his hernias. Ex. 2 at 245-47. Following this conversation, Mr. March signed an informed consent form specifying the risks of the procedure, including "burning injuries," as well as "damage to the bowel," and "damage to the stomach," which "may be discovered during the procedure or later." Ex. 3 at 688-90; *see* Tr. 342:2-343:4.

On June 15, 2015, Dr. Schlessel, an attending physician, and Dr. Lujic, a fourth-year medical resident, performed a laparoscopic ventral hernia repair with mesh on Mr. March at the VA. Pls.' Post-Trial Findings ¶¶ 3, 14; Def.'s Post-Trial Findings at 4. A first-year resident, Dr. Chang, also was present. Def.'s Post-Trial Findings at 9. At all relevant times, Drs. Schlessel and Lujic were acting as agents/employees of the VA. Pls.' Post-Trial Findings ¶ 5. At all relevant times, the Defendant operated the VA. Def.'s Post-Trial Findings at 4.

Mr. March's surgery involved the removal of adhesions, the formations of scar tissue that stick the bowel to the abdominal wall. Pls.' Post-Trial Findings ¶ 6; Tr. 83:2-20. The removal of adhesions can involve sharp dissection, blunt dissection, and/or electrocautery, which uses heat to burn away adhesions. Pls.' Post-Trial Findings ¶ 6; Tr. 85:1-25. Electrocautery, the most dangerous method of removing, or "lysing," adhesions, is the method of last resort. Tr. 85:16-18. The post-operative note stated that all of the above methods – scissors, electrocautery, and blunt dissection – were used to remove the adhesions in Mr. March's abdomen. *Id.* 104:16-105:2; Ex. 2 at 465-470.

Though Dr. Schlessel and Dr. Lujic both testified that they did not remember the specifics of the procedure performed on Mr. March, they relied on the postoperative note and their general practices to explain their roles in Mr. March's procedure. Tr. 81:17-22, 221:10-12. During the procedure, Dr. Lujic handled the instruments and physically performed the operation, *id.* 188:12-24, while Dr. Schlessel supervised, providing direction and input, *id.* 183:7-15. Specifically, Dr. Schlessel testified that he stood on the left side of the body, while Dr. Lujic and Dr. Chang, who held a camera that projected the laparoscope's picture onto two large monitors, stood on the right side of the body. *Id.* 187:25-188:18, 221:21-222:4. While Dr. Schlessel remained "scrubbed" for the entire operation, perhaps short of the closing of the skin, he testified that it was possible that he stepped away from the operating table toward the end of the procedure. *Id.* 186:5-187:9.

Dr. Lujic testified that during a laparoscopic ventral hernia repair procedure, the goal is to avoid injury to the small bowel at all costs. *Id.* 86:2-4. He testified that if an injury occurs during the procedure, the goal is to identify the injury and fix it during the operation. *Id.* 89:4-7. He testified further that he looked for injuries to the bowel at "[e]very step" of lysing the adhesions. *Id.* 92:24-93:2. To check for injuries, both Drs. Lujic and Schlessel testified that their procedure was to "run the bowel," or, as Dr. Lujic testified, to look at it from both sides to see all portions of the small bowel involved in the surgery. *Id.* 148:9-18; 200:1-7.

As both Dr. Lujic and Dr. Schlessel testified, a thermal injury, or an injury resulting from electrocautery, can be caused by heat being transferred from one area of the body to another, through a process called "arcing." *Id.* 135:5-17; *Id.* 201:20-202:5. Dr. Schlessel testified that a burn injury can progress, over the course of several days, into a complete perforation of the bowel wall. *Id.* 199:21-25.

14

The postoperative note dictated by Dr. Lujic does not mention "running the bowel" at the end of the procedure, which Dr. Lujic conceded at trial. *See id.* 105:24-106:22. Dr. Lujic testified that he inspected the bowel while he removed the adhesions, but not again after that. *Id.* 110:15-21. Dr. Lujic testified further that a careful, thorough inspection should uncover any injuries to the bowel. *Id.* 110:22-24. He also agreed at trial that, during Mr. March's procedure, either he did not look at the area of bowel that was injured or looked at the area and did not see the injury. *Id.* 117:25-119:5. The postoperative note does state that "[t]here was no sign of bowel perforation or bowel injury or deserosalized bowel visible on inspection." Ex. 2 at 465-66. It also includes a section describing the point at which "mesh is introduced into the abdomen," stating that "upon direct visualization, the mesh laid flat," and observed further that "[u]nder direct visualization desufflation was obtained." *Id.*

Dr. Schlessel testified that his practice is to inspect the bowel during and after the removal of adhesions, then to inspect it again once the small bowel is freed from the abdominal wall, and to inspect it a final time at the completion of the procedure. *Id.* 196:5-21. He testified that if Dr. Lujic had gone to place the mesh at the end of the procedure without doing a final examination of the bowel, he would have told him to stop and conduct a final inspection. *Id.* 243:7-12. He testified further that Dr. Lujic likely did not write down additional inspections of the bowel because it was "so routine." *Id.* 234:14-18. As Dr. Schlessel testified, the postoperative note did not indicate whether they looked "at the bowel several more times before closing and completing the procedure." *Id.* 235:19-25.

Though he agreed that the most likely explanation for Mr. March's later injuries was an undiagnosed injury to his bowel during the laparoscopic ventral hernia repair procedure, Dr. Schlessel also testified that during the procedure, he was "quite sure" there was not a bowel

injury. *Id.* 252:22-253:6. Dr. Schlessel also testified that Dr. Lujic was "wrong" when he testified

that there was no final inspection of the bowel, and that he must have been "recollecting

incorrectly" if he so testified. *Id.* 261:12-262:6. He testified further that if he and Dr. Lujic did

not inspect the abdomen at the end of the procedure, this would be a violation of the standard of

care. *Id.* 262:9-17 ("If we did not inspect the abdomen, I would say that that was not the standard

of care.").

### C.  Events Following the Laparoscopic Ventral Hernia Repair Procedure

On June 16, 2015, Mr. March reported a 10/10 pain level before being medicated with

morphine. *See* Ex. 2 at 188.

On June 17 and June 18, 2015, he reported a 3/10 pain level. *See id.* at 151, 165.

On June 19, 2015, he reported a 2/10 pain level.[7] *Id.* at 125.

On June 20, 2015, Mr. March was discharged. *Id.* at 64. He was prescribed pain

medication, *see id.* at 105, and was advised to call his physician if his pain worsened while on

the medication, *see* Ex. 3 at 687.

On June 22, 2015, the VA called Mr. March. *See* Ex. 2 at 103. The VA's records show

that during the call, Mr. March explained he was "in pain," and the nurse "discussed pain med.,"

then the note observed that "he is not following the proper dosing of his pain medication." *Id.*

On June 23, 2015, Mr. March had a fever, Tr. 336:1-3, and presented to Manchester for

treatment, *see* Trial Exhibit 5 ("Ex. 5") at 2056. According to medical records, Mr. March

reported "that he had redress, swelling, and yellow drainage from his abdominal wall for the past

---

[7] Though Mr. March testified at trial that during his hospitalization "[t]he pain never stopped," and he "would describe it as a 10, a 10, and a 10," *see* Tr. 295:1-9, the Court finds more accurate, and thus weighs more heavily, the medical records describing Mr. March's contemporaneous self-reports of his pain levels.

16

24 hours," but "denied any fever[]," "denie[d] any increase in his pain level since surgery," and reported "constant mild diffuse dull and non[-]radiating abdominal pain." *Id.* at 2062.

That same day, a computerized tomography (CT) scan at Manchester showed "findings consistent with perforated viscus." *Id.* at 2095. Following the CT scan, Dr. Suede evaluated Mr. March; according to Dr. Suede's note of the evaluation, Mr. March reported that "prior to his [June 20] discharge [from the VA], he noticed severe swelling and redress in his left lower quadrant at the site of one of his ventral hernias." *Id.* at 2119-20.

Also, that same day, Dr. Suede performed an exploratory laparotomy. *Id.* at 3636. Dr. Suede performed the surgery in part to determine the site of any perforation. Tr. 22:13-24, 23:5-23. During the procedure, Dr. Suede observed bowel contents and "feculent material" in the abdomen. *Id.* 22:9-12, 22:25-23:4. A preoperative note entered by a physician's assistant ("PA") present for Mr. March's procedure, *see id.* 40:7-16, offered a diagnosis of "peritonitis, possible bowel perforation," while the postoperative diagnosis was "infected mesh, intrabdominal abscess." Ex. 5 at 2173. The PA's postoperative report stated that Mr. March's status was "stable, no bowel perforation found." *Id.* Dr. Suede testified that the condition that Mr. March came in with was "life[-]threatening," and the surgery, an "emergency operation," was considered "life[-]saving." Tr. 19:2-6.

After the procedure, mesh removed from Mr. March's abdomen was sent to pathology. Ex. 5 at 3859. The pathologist offered a "clinical diagnosis" of "intra-abdominal sepsis, status post ventral hernia repair 8 days ago at VA Hospital," and noted "areas of granulation of tissue and necrosis." *Id.* The report stated further: "Explanation of mesh: skin and subcutaneous tissue with marked acute and chronic inflammation and necrosis." *Id.*

Dr. Suede planned a "second look laparotomy" and ordered a Gastrografin enema, or CT scan with contrast administered rectally, to "locate . . . the colonic injury." *Id.* at 2132. On June 23, 2015, Mr. March underwent the Gastrografin enema, which did not identify a leak but confirmed "scattered colonic diverticula without evidence of . . . diverticulitis." *Id.* at 2043. On June 26, 2015, Dr. Suede performed the second look laparotomy. *Id.* at 3638; Tr. 60:2-4. In his operative report, Dr. Suede stated that he did not see an "enterotomy," or a hole or incision created by a surgeon, but after seeing "bilious material . . . pooling," decided to resect portions of the bowel. Ex. 5 at 2126-28. His note stated that "[w]e did not cause any injuries to the bowel and there was no evidence of any perforation except this one area of loop that was stained with bile," and "[t]here was no evidence of any bowel injuries anywhere else." *Id.* at 2126-27.

The portions of bowel resected by Dr. Suede were sent to pathology, which on inspection detected a "[s]mall intestinal diverticulum with perforation and acute suppurative peritonitis." *Id.* at 3860.

Following the second procedure, as Dr. Suede testified, there remained "significant swelling" and the "abdominal wall was significantly damaged from the first operation, from the infection, severe infection and the abscesses and hernias of the abdominal wall." Tr. 30:17-25. Mr. March was ultimately discharged with home nursing care, which Dr. Suede testified that he needed because Manchester doctors "thought he was not able . . . to take care of himself," and "did not think that his family, his wife by herself, would be able to care for him because of his significant medical needs." *Id.* 33:6-12.

Mr. March subsequently sought mental health treatment. On May 10, 2016, he told his provider, in part, that he had had "a nervous breakdown in October after my laparoscopic hernia repair," "[b]efore the surgery I was fearless, [and] now I am afraid all the time," "get[s] bouts of

frustration, I snap. I try to control," and "[a]t night I wake up almost every hour. I cannot sleep in bed, have to sleep sitting up." Trial Exhibit 12 ("Ex. 12") at HV004. He was diagnosed with "mood disorder [with] major depressive-like episode due to medical condition." *Id.* at HV005. He saw the mental health provider several times, *id.* at HV001-13, but was ultimately discharged due to lack of attendance after failing to attend a December 16, 2016 appointment, *id.* HV014-15. Mr. March also testified that he attends osteo manipulation therapy, or OMT, every three to five weeks. Tr. 309:23-310:8. Mr. March testified that he wears an abdominal binder "24/7, with the exception of a shower," to "pull[] [his] abs together and support[] [his] diaphragm to breathe." *Id.* 3:15-17. He testified that without a binder, he feels "nauseous, . . . almost like being seasick," as his "innards are kind of floating around freely." *Id.* 312:18-23. He testified that there is never a time where he feels like there is no pain and that he is comfortable. *Id.* 317:7-10.

Mrs. March testified that Mr. March's physical condition had caused a "[c]omplete loss of physical relationship," and required her to bear "a lot more responsibility" in the household. *Id.* 348:3-19. She testified that that Mr. March's condition had caused her to feel both resentment and guilt. *Id.* 348:20-349:23. She testified that though she and Mr. March had attempted to have a physical relationship, they were unable to, which made her feel "[e]ven less of a woman or wife." *Id.* 351:15-24. She testified that she at times needs to help him into the shower, and to take off his binder, and that she makes all the family meals and does all of the household chores. *Id.* 352:4-17.

## V.    CONCLUSIONS OF LAW

The Federal Tort Claims Act ("FTCA") waives the federal government's sovereign immunity with respect to certain tort claims arising out of the conduct of Government employees. 28 U.S.C. § 1346(b)(1); *see also Devlin v. United States*, 352 F.3d 525, 530 (2d Cir.

2003). The liability of the federal government under the FTCA is determined according to the law of the state in which the injury occurred. *See* 28 U.S.C. § 1346(b); *Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir. 1998). The parties agree that the claimed acts and omissions occurred in Connecticut; the substantive tort law of Connecticut therefore applies.

"A plaintiff alleging medical malpractice in Connecticut must first prove that the defendant failed to conform to 'the standard of proper professional skill or care on the part of a physician.'" *Allen v. United States*, 472 F. Supp. 2d 204, 209 (D. Conn. 2007) (quoting *Edwards v. Tardif*, 240 Conn. 610, 614 (1997)). "The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Conn. Gen. Stat. § 52-184c(a). In addition, the plaintiff must "establish a causal relationship between the physician's negligent actions or failure to act and the resulting injury by showing that the action or omission constituted a substantial factor in producing the injury," *Allen*, 472 F. Supp. 2d at 209 (quoting *Edwards*, 240 Conn. at 615)), and "must generally show that the defendant's negligent act or omission was a 'but for' cause of the injury, that the negligence was causally linked to the harm, and that the defendant's negligent act or omission was proximate to the resulting injury," *id.* (citing *Zuchowicz*, 140 F.3d at 388)).

Furthermore, it is "well established" in Connecticut that in a medical malpractice claim, a plaintiff must "prove by a preponderance of the evidence[] (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury," and generally must do so by way of "expert testimony . . . because the requirements for proper medical diagnosis and treatment are not within the common knowledge of laypersons." *Hayes v. Camel*, 283 Conn. 475, 483-84 (2007) (internal quotation

marks omitted). "Proof by a preponderance of the evidence amounts to a showing that a particular fact is more likely than not to be true, or a particular event was more likely than not to have occurred." *Deleon v. Nolan*, No. CV136047130S, 2015 WL 9871310, at *1 (Conn. Super. Ct. Dec. 14, 2015) (citing *Lopinto v. Haines*, 185 Conn. 527, 533 (1981) ("The burden of persuasion in an ordinary civil action is sustained if evidence induces in the mind of the trier a reasonable belief that it is more probable than otherwise that the fact in issue is true." (internal quotation marks omitted))); *Colon v. Metro-North Commuter R.R. Co.*, No. 3:13-cv-00325 (JAM), 2017 WL 3443830, at * (D. Conn. Aug. 9, 2017) (discussing "civil action[s] where the plaintiffs need only prove their case by a preponderance of the evidence, *i.e.* show that their account of the facts is more likely than not to be true"); *Terminal Taxi Co. v. Flynn*, 156 Conn. 313, 318 (1968) ("It was not necessary that the plaintiffs' proof of negligence negate all possible circumstances which would excuse the defendant. Nor was it necessary that the proof rise to that degree of certainty which excludes every reasonable conclusion other than that reached by the jury." (internal citations omitted)); *Cross v. Huttenlocher*, 185 Conn. 390, 394 (1981) (defining "fair preponderance of the evidence" as "the better evidence, the evidence having the greater weight, the more convincing force").

The parties disagree as to (1) the articulation of the standard of care in this case; (2) whether Drs. Schlessel and Lujic deviated from, or breached, the standard of care during the laparoscopic ventral hernia repair procedure; (3) whether Drs. Schlessel and Lujic caused the injuries Mr. March alleges he suffered; and (4) the extent of any economic and non-economic damages. *See* Def.'s Reply at 3–13.

The Court addresses each issue in turn.

### A.  Standard of Care

The parties agree that Connecticut General Statutes § 52-184c statutorily defines the standard of care in a medical malpractice case and that, under Connecticut law, the relevant standard of care is based on a national standard, not a local standard. Pls.' Post-Trial Findings ¶ 10; Def.'s Reply at 1. The parties disagree, however, as to the articulation of the standard of care with respect to the laparoscopic ventral hernia repair procedure performed on Mr. March. *See* Pls.' Post-Trial Findings ¶ 11; Def.'s Post-Trial Findings at 35 ¶ 1 – 41 ¶ 16.

Plaintiffs argue that the standard of care for a laparoscopic ventral hernia repair procedure "requires the surgeons to vigilantly, carefully and thoroughly inspect the bowel for injuries," which is "especially important when the surgeons use electrocautery, as they did here." Pls.' Post-Trial Findings ¶ 11. Plaintiffs argue further that "[t]he standard of care requires the surgeons to inspect the bowel for injuries while the adhesions are being taken down; after the bowel is free of adhesions and at the end of the surgery, before closing the abdomen." *Id.* ¶ 14.

Defendant argues that Plaintiffs have "failed to prove that the standard of care requires a surgeon's inspection to be 100% accurate at preventing bad outcomes, *i.e.*, to detect every burn that later becomes clinically significant," Def.'s Post-Trial Findings at 35 ¶ 1, and that the evidence presented at trial shows that a failure to identify a burn injury during a laparoscopic ventral hernia repair procedure does not constitute a breach of the standard of care, *id.* at 36 ¶¶ 7-8, 38 ¶ 14. Defendant also argues that Plaintiffs "did not prove that the standard of care requires the surgeons to 'run the bowel' after inserting hernia repair mesh," *id.* at 38 (emphasis omitted), and rather that the evidence presented at trial instead shows that "[a] review of the bowel (*i.e.*, running the bowel) before placing the mesh is sufficient to identify any burn injuries," *id.* at 41 ¶ 12.

Generally, except in cases where "the want of care or skill is so gross that it presents an almost conclusive inference of want of care," "the testimony of an expert witness is necessary to establish both the standard of proper professional skill or care on the part of a physician, . . . and that the defendant failed to conform to that standard of care." *Edwards*, 240 Conn. at 614-15 (internal citations omitted). Here, both Plaintiffs' and Defendant's articulations of the standard of care rely on the testimony of the treating and non-treating physician experts at trial: Drs. Smith, Novitsky, Schlessel and Lujic. *See* Pls.' Post-Trial Findings ¶¶ 11, 13-14; Def.'s Post-Trial Findings at 35-42.

Dr. Lujic, who was not board-certified at the time of his testimony, Tr. 120:13-24, opined that the standard of care requires surgeons, while they are lysing adhesions, to keep in mind the risk of injury, *id*. 97:21-24; and to be conservative with electrocautery, *id*. 118:11-15. He also opined that the standard of care requires a surgeon in this type of operation to find any and every injury during an operation such as a laparoscopic ventral hernia repair procedure, *id*. 121:14-17, but also agreed that in the exercise of reasonable medical care, a surgeon could miss an injury, *id*. 121:19-22. He opined further that if a thermal injury is detected intraoperatively, the standard of care requires a surgeon to address it by stitching together that area. *Id*. 95:15-19. Generally, he opined that the standard of care is to protect the bowel if possible, inspect the bowel for injuries, and if an injury is detected, to remedy it. *Id*. 95:20-24.

Dr. Schlessel, the attending physician, opined that the standard of care during a laparoscopic ventral hernia repair procedure requires a surgeon to carefully inspect the bowel while adhesions are being taken down, once the bowel is freed, and at the end of the procedure just before finishing. *Id*. 206:2-7. He opined that the standard of care requires a surgeon, if an injury is detected, to fix the injury when it is recognized. *Id*. 206:8-11. He opined further that the

standard of care requires reinspection of the bowel once the mesh has been secured and also before finishing the procedure. *Id.* 206:12-23; *see also id.* 259:2-7 ("Q: And you also agreed with me that final inspection of the bowel is the standard of care, right? A: It's my standard of care. You know, I don't know that it's spelled out in black and white, but sure. Q: You believe it to be the standard of care? A: Yes.").

Dr. Smith, Plaintiffs' expert, a board-certified general surgeon, *id.* 364:1-10, who testified he had performed hernia repair surgeries "50 or 75" times in the past year, *id.* 366:8-11, also opined as to the standard of care. Dr. Smith opined that "[g]reat care must be taken" when removing adhesions, but this is "to a large degree, based on judgment," *id.* 379:7-17; that surgeons should "reinspect the bowel intermittently," *id.* 380:4-5; and that "the most important aspect of that reinspection is before the closure is begun, that the bowel is completely reinspected . . . for any evidence of bowel injury," *id.* 380:5-10. Dr. Smith agreed that the standard of care requires a surgeon to take all measures to protect the bowel if possible. *Id.* 380:14-19. He opined further that a failure to inspect the entire bowel before closing would be a violation of the standard of care. *Id.* 454:11-21.

Dr. Novitsky, Defendant's expert, director of the Hernia Center at Columbia University, *id.* 481:12-17, opined that it was important, before placing the mesh, to review the bowel for injury, *id.* 506:25-507:2. He opined, however, that the time when one must "run the bowel," or inspect every segment of the bowel, is at the end of adhesiolysis, or the removal of adhesions, but before introducing any mesh. *Id.* 507:24-508:11. He opined that it was critical to do so at this time because if a surgeon waits until the end of the operation to run the bowel, this would require "undo[ing] the entire surgery." *Id.*

In his view, however, surgeons should minimize their handling of the bowel, because every time a surgeon touches intestines, or runs the bowel, it risks injury. *Id.* 509:15-23, 510:15-20. In his practice, after he places the mesh, he does not run the bowel again to look for injury, because his prior inspection would have ruled out any injury. *Id.* 512:3-8. He opined that he would be "very much against" instructing surgeons to run the bowel again because he would worry that it would injure the intestines or undo the surgery. *Id.* 513:7-12. Proper precautions, however, require a thorough inspection of the bowel, including looking specifically for burn injuries, *id.* 580:20-581:6, and surgeons are encouraged to inspect all areas of the bowel, even those not involved in the adhesions, *id.* 587:22-588:1. He also agreed that it was important to inspect the bowel "at the end of the procedure." *Id.* 595:22-596:2. He opined that because Drs. Schlessel and Lujic were conscientious of the risks of thermal injury, minimized the use of electrocautery, and ran the bowel and found no injuries, they satisfied the standard of care. *Id.* 594:20-595:2.

In short, all of the surgeons agreed that it is the standard of care to inspect the bowel carefully during and after the removal of adhesions, as well as to minimize the use of electrocautery, and be aware of the risks of thermal injury when electrocautery is used. Moreover, Dr. Schlessel and Dr. Smith both testified that the standard of care requires a third, or final, inspection of the bowel before closing the abdomen. *See id.* 206:1-7; 390:18-391:3.

Though Defendant's expert, Dr. Novitsky, testified that he does not generally run the bowel after placing mesh, because this may create a risk of injury to the bowel, *see id.* 512:3-21, he also agreed that it was imperative to "carefully inspect" the bowel again at the end of the procedure, *id.* 595:22-596:8; *id* 591:1-596:8 ("Q: And do you agree, Doctor, that it is imperative to carefully inspect the bowel at the end of the case to make sure you didn't miss any inadvertent

25

injuries? . . . Q: [(reading from Mr. Novitsky's deposition testimony)] Question: 'Do you agree with this, Doctor. It's the surgeon's duty to make sure the bowel is not injured during a hernia surgery and the inspection is important.' Answer: 'Are we just rephrasing the same thing? And I'm not sure. So, yes, it's imperative to carefully inspect the bowel at the end of the case to make sure you didn't miss any inadvertent injuries.' Did you tell me that at your deposition? A: You clearly are not showing our conversation, but yes, I said it's imperative to inspect the bowel. . . . . Q: And in your own words it is imperative to carefully inspect the bowel again at the end of the procedure, right? A: You look at the bowel, yes.").

As a result, three of the four experts agree that the standard of care requires a surgeon to inspect the bowel carefully for evidence of a bowel injury before closing the abdomen at the end of the procedure.[8] Thus, by a preponderance of the evidence, the standard of care requires a careful inspection of the bowel before closing the abdomen at the end of the procedure.

By a preponderance of the evidence, the standard of care, however, does not require a surgeon to find each and every injury that may arise during a laparoscopic ventral hernia repair procedure. On cross-examination, Dr. Smith testified that a surgeon could "potentially" fail to identify a microscopic burn even in the exercise of reasonable care. *Id.* 450:13-19. Similarly, Dr. Novitsky agreed that even in an exercise of reasonable care, a surgeon could fail intraoperatively to identify a thermal injury to the bowel in a procedure such as Mr. March's. *Id.* 513:20-24. And though Dr. Lujic agreed with the statement that the "standard of care require[s] a surgeon in an operation such as this to find any and every injury," he immediately after agreed with the

---

[8] Dr. Lujic, for his part, did not provide testimony as to whether the standard of care requires a final inspection before closing the abdomen; in relevant part, he testified only that, as a general practice, he examines the bowel while removing the adhesions and after the adhesions are taken down, but not again before finishing the surgery. *Id.* 110:15-21.

statement that it is "possible in the exercise of good medical judgment and reasonable medical care that a surgeon could miss an injury." *Id.* 121:14-22.

Accordingly, the standard of care required Drs. Schlessel and Lujic to inspect the bowel carefully before the end of the medical procedure, and to minimize the use of electrocautery and continually inspect for burn injuries at all parts of the bowel, but did not require Drs. Schlessel and Lujic to find any and every injury that may have occurred during the laparoscopic ventral hernia repair procedure.

### B.  Deviation from the Standard of Care

Plaintiffs argue that the evidence shows that during the laparoscopic ventral hernia repair procedure, Drs. Schlessel and Lujic deviated from the standard of care because they "did not inspect the bowel at the end of the surgery, before closing the abdomen." Pls.' Post-Trial Findings ¶ 18. Plaintiffs also argue that during the procedure, Drs. Schlessel and Lujic deviated from the standard of care by "fail[ing] to identify the intraoperative burn injury to Mr. March's small bowel." *Id.* ¶ 20; *see also id.* ¶ 22 ("The failure to carefully inspect the bowel so as to identify the burn injury was a violation of the standard of care applicable to surgeons in 2015.").

As to the first point, that Mr. March's surgeons deviated from the standard of care by failing to identify an interoperative burn injury, Defendant argues that Drs. Schlessel and Lujic performed "a careful review of Mr. March's bowel and did not identify any injury," Def.'s Post-Trial Findings at 44 ¶ 10 (internal quotation marks omitted); that "[t]here was no testimony that the manner in which Dr. Schlessel and Dr. Lujic performed the bowel inspection was deficient," *id.* ¶ 12; and that Plaintiffs have failed to prove that Drs. Schlessel and Lujic "failed to do a careful, thorough inspection of the bowel," *id.* at 46 (emphasis omitted). Defendant also argues that "Plaintiffs did not prove that Drs. Schlessel and Lujic failed to run the bowel after placing

the repair mesh," *id.* at 49 (internal quotation marks and emphasis omitted), because although Dr. Lujic testified that he did not inspect the bowel after completing his removal of the adhesions, he did not testify to his memory of the surgery, but rather to his custom and practice, as well as to the postoperative note, *id.* at 50 ¶¶ 6-7. As Defendant argues, Dr. Schlessel's testimony – that if Dr. Lujic had started to close the bowel after placing mesh without re-running the bowel, he would have stopped him and made him do it – should instead be credited, and Dr. Lujic's should be discounted. *Id.* 50-51 ¶¶ 4, 9, 10.

The Court disagrees.

As stated above, the relevant standard of care, as proven by the experts at trial, required Drs. Schlessel and Lujic to inspect the bowel carefully before the end of the medical procedure, and to minimize the use of electrocautery and continually inspect for burn injuries at all parts of the bowel. Therefore, Drs. Schlessel and Lujic were required to, before closing up Mr. March's abdomen, examine Mr. March's bowel carefully for injuries.

On whether Drs. Schlessel and Lujic did, in fact, conduct such a final, careful examination of the bowel, the postoperative note does not indicate that this inspection happened. The postoperative note states, in relevant part, that "[t]here was no sign of bowel perforation or bowel injury or deserosalized bowel visible on inspection." Ex. 2 at 466. But this reference is to after the removal of the adhesions, and does not address what happened later in the procedure.

And Dr. Lujic did not recall the specifics of the surgery, *id.* 81:17-19, 82:18-20, but spoke about the surgery based on his understanding of the postoperative note and his day to day practice, *id.* 81:20-82:6. He testified that although he inspects the bowel while removing the adhesions and after the adhesions are taken down, he does not inspect the bowel again before finishing the surgery. *Id.* 110:15-21.

28

Dr. Schlessel testified that he was "scrubbed for the entire operation,"[9] though he could not recall whether he was "scrubbed" for the closure of the skin. *Id.* 186:2-8. He testified that he had no recollection as to whether he left the room or merely stepped away from the table, but testified that a likely scenario was that he "s[a]t in the corner" in the event "there was a problem with the excavation or something toward the end of the procedure." *Id.* 186:15-187:4. He testified that he would likely have felt comfortable "stepping back" given that Dr. Lujic was a fourth-year resident. *Id.* 187:10-14. He agreed that Dr. Lujic would have physically performed the majority of the procedure from start to finish, unless he (Dr. Schlessel) thought something was wrong. *Id.* 188:19-189:4.

He did not recall, however, stepping in to correct anything Dr. Lujic had done, *id.* 189:19-22, and stated that there was nothing significant he recalled about the operation that was not referenced in the operative note, *id.* 204:9-13. He testified that the note was likely missing the critical piece of information that "we did look at the bowel several more times before closing and completing the procedure." *Id.* 235:19-25. He testified that if Dr. Lujic had attempted to place the mesh without an examination of the bowel, he would have stopped him and told him to examine the bowel, *id.* 243:7-12, and would have "insisted that it be done," *id.* 244:15-19. He also agreed that there were many routine parts of the surgery that were described in the postoperative note, including insufflation and deflation. *Id.* 260:21-261:4. Finally, he opined that Dr. Lujic was "wrong" when he testified that there was no final inspection of the bowel, and that because he was the "one in charge," "[i]t would not have happened that way." *Id.* 261:12-23.

Though neither Dr. Lujic or Dr. Schlessel recalled Mr. March's procedure with specificity, given Dr. Lujic's testimony that he did not do a final inspection of the bowel as a

---

[9] Dr. Schlessel defined "scrubbed" as "actively participating in the operation," and agreed that this meant that he was "sterile, . . . gowned, . . . gloved, [and] in the field." Tr. 185:14-22.

matter of custom or practice and the absence of any reference to such an inspection in the postoperative note, it is more likely than not that no final inspection occurred. Though Dr. Schlessel's testimony that he would have required Dr. Lujic to inspect the bowel after placing the mesh is credible, neither Dr. Schlessel nor Dr. Lujic recalled any such intervention. Moreover, Dr. Schlessel stated that it was likely that he was not at the table toward the "end of the procedure," *id*. 186:15-20, 187:1-4, particularly for the "closure of the skin," *id*. 186:2-8.

While Defendant argues that the closure of the skin is not "toward the end of the surgery," Def.'s Reply at 4, Defendant's own expert, Dr. Novitsky opined that with respect to hernia repairs with mesh, the "end of the procedure" is the "end of the peritoneal portion," after the mesh has been secured, *id*. 590:15-25, and in any event, this argument does not address whether Dr. Schlessel would have seen whether Dr. Lujic completed a final inspection of the bowel.

Defendant also argues that because, in its view, the operative report states that the surgeons had "direct visualization" of the mesh and bowel during desufflation, and Dr. Schlessel testified that this "direct visualization" is one way of "inspecting the bowel," Drs. Schlessel and Lujic did, in fact, perform the careful inspection required under the standard of care. Def.'s Post-Trial Findings at 15-16; 50-51 ¶¶ 8-9. As Defendant argues, "[t]he whole of the testimony makes clear that there are different kinds of 'inspection,'" which can include "closely looking at the bowel while the surgeon lyses it," "'running the bowel' from end to end," "directly visualizing the bowel while deflating the abdomen," or "simply using the laparoscope to 'look around' the area." *Id*. at 50-51 ¶ 8.

But a close reading of the postoperative note, and consideration of the testimony as a whole, does not support this argument. "Direct visualization" is mentioned in two sentences in the postoperative note, both which refer to the placement of the mesh:

> The mesh was then introduced into the abdomen, aligned properly, and with the use of a suture passer, all areas with suture were withdrawn from the abdomen. Once these were externalized and upon direct visualization, the mesh laid flat. These were tied down and subsequently absorbable tacks were placed and circumferentially approximately 1 cm from each other for the entire circumference of the mesh. Under direct visualization desufflation was obtained."

Ex. 2 at 465-66. A plain reading of the postoperative note indicates that the first mention of "direct visualization" refers to the area from which the sutures had been withdrawn and the flatness of the mesh; the second mention of "direct visualization" refers to desufflation, which was defined during Dr. Suede's testimony as when the air is taken out of the abdomen to see what happens when the abdominal wall goes back into its natural position, to ensure the bowel is not involved in the mesh. Tr. 109:20-110:5. Dr. Schlessel agreed that at that point of the procedure, he would be looking at, under "direct visualization," "the abdominal wall settling back down into place with the mesh in place," "and also inspecting the small bowel," but also agreed on cross-examination that the operative note "d[id] not describe a final inspection of the bowel before desufflation occurs." *Id.* 258:3-259:1.

While Dr. Schlessel's testimony may be probative of the suggestion that at the time of desufflation, he or Dr. Lujic "inspected" the small bowel, there is no evidence on the record as to the depth or degree of that inspection or that the inspection was undertaken for the purpose of ensuring there was no injury to the bowel, particularly a thermal injury. To the contrary, Dr. Schlessel indicated that during the "direct visualization" he looked at "the field," rather than focusing specifically or only on the small bowel. *Id.* 258:6-11.

31

Defendant also suggests that Dr. Novitsky's testimony supports its argument that this "direct visualization" satisfies the standard of care, because, in Defendant's view, it makes clear that there are different kinds of "inspection," one of which is "look[ing]" at the bowel.  Def.'s Post Trial-Findings at 50-51 ¶ 8. But when Dr. Novitsky gave this testimony, he had previously testified that that it was imperative not just to "look" at the bowel, but to carefully inspect the bowel at the end of the procedure to ensure a surgeon did not miss any inadvertent injuries.[10] *See* Tr. 591:1-596:8.  Indeed, Dr. Novitsky, along with all of the other testifying surgeons, agreed that it was critical to conduct careful inspections of the bowel throughout the procedure specifically with the purpose of detecting and repair potential injuries. *See, e.g.*, *id.* 196:22-197:14 (Dr. Schlessel) ("Q: And that's important . . . because you want to obviously have ongoing careful inspections of the bowel, right? A: Yes. . . . Q: . . . The other reason you do that is because there is always a chance that during the inspection that you do as the bowel is being taken down from the adhesions and once the bowel is free, there is a chance you might miss an injury, right? A: Right."); *id.* 588:14-16 (Dr. Novitsky) (Q: If a surgeon doesn't do careful inspection, that increases the risk of missing the injury? A: Correct."); *id.* 121:24-122:4 (Dr. Lujic) ("A: So there is a lot of bowel to cover. . . . And the human body in general is very good at trying to hide things, which is why we are over careful at inspection."); *id.* at 95:20-24 (Dr. Lujic) ("Q: Okay. So, again, standard of care is protect the bowel if you can, inspect the bowel for injuries, and if you detect an injury intraoperatively, fix it? A: Correct."); *id.* 471:24-472:5 (Dr. Smith) ("Q: I just want to make sure, Dr. Smith, that we understand, in general the violation of the standard of care that you have offered here is that there was a failure to do a careful,

---

[10] The Government objected to Plaintiff confronting Dr. Novitsky with his deposition testimony, *see* Tr. 592:12-13, and the Court invited the Government to address the line of questioning on redirect, *id.* 592:15-19. The Government, however, did not address this issue on redirect, *see id.* 597:4-600:19, or otherwise provide a basis for discounting or otherwise declining to consider this portion of the record.

thorough inspection of Mr. March's small bowel during the laparoscopic procedure, right? A: Yes.").

Moreover, given the serious risks that an undetected injury poses, it is more likely than not that any such "inspection" or "visualization" would need to be done specifically with the goal of detecting such injuries. *See, e.g.*, *id*. 381:9-382:6 (Dr. Smith) ("Q: . . . Why is it better for the patient to have any injuries detected during the surgery as opposed to later on? A: . . . If an injury is detected at the time of the original operation . . ., it can be easily repaired at that point without causing the patient much greater risk. . . . [T]hat will prevent spillage, fecal contamination or enteric contamination in the abdomen which will causes sepsis and really is a life-threatening situation.").

As Dr. Smith described, "[o]f course [surgeons are] directly observing your field of dissection, so you are looking for any potential for bowel injury as you operate," but "additionally you should reinspect the bowel intermittently[,] and I think the most important aspect of that reinspection is before the closure is begun, that the bowel is completely reinspected . . . for any evidence of bowel injury." *Id*. 380:1-10. This is "very, very important[] to identify injuries that may appear later in the patient's course with serious consequences." *Id*. 380:11-13.

Therefore, even if the postoperative note suggests that Drs. Schlessel and/or Lujic had "direct visualization" of the bowel,[11] as Dr. Schlessel testified, this is an insufficient basis to conclude that this "direct visualization" constituted the kind of careful inspection meant to locate and address bowel injuries, specifically thermal injuries, when electrocautery is used, as required by the standard of care. As a result, weighing the custom and habit testimony of Dr. Lujic, who

---

[11] The postoperative note does not itself identify whether this "direct visualization" was of the bowel nor indicate precisely what the surgeons had "direct visualization" of during desufflation or the laying of the mesh. Ex. 2 at 465-66.

principally performed the surgery, *id.* 78:13-16, 81:8-16; 188:19-24, and the absence of a description of the timing and extent of any final inspection of the bowel before ending the operation to ensure that there had been no thermal injury to the bowel in the postoperative note, in accordance with the standard of care, it is more likely than not that a final inspection of the bowel before the end of the medical procedure, as required by the standard of care, by Drs. Lujic and Schlessel did not occur.

As to Plaintiffs' second argument, that during the procedure, Drs. Schlessel and Lujic deviated from the standard of care by "fail[ing] to identify the intraoperative burn injury to Mr. March's small bowel," Pls.' Post-Trial Findings ¶ 20; *see also id.* ¶ 22 ("The failure to carefully inspect the bowel so as to identify the burn injury was a violation of the standard of care applicable to surgeons in 2015."), the Court agrees.

To be clear, as discussed above, the standard of care did not require Drs. Schlessel and Lujic to find any and every injury that may have occurred during the laparoscopic ventral hernia repair procedure. Indeed, all of the experts agreed that certain burn injuries could be undetectable, even in the exercise of reasonable care. *See* Tr. 150:3-6 (Dr. Lujic); 197:8-14, 215:6-13 (Dr. Schlessel); *id.* 394:3-13, 439:2-4, 450:13-15 (Dr. Smith); *id.* 513:20-24, 516:17-517:1 (Dr. Novitsky). And, as Dr. Novitsky credibly testified, there are challenges posed by viewing the bowel and abdomen through a laparoscope during an operation such as a laparoscopic ventral hernia repair procedure. *See id.* 487:11-488:18. As a result, it is not a deviation from the standard of care for these surgeons to have failed to identify each and every possible injury to Mr. March's bowel. But, as discussed below, the preponderance of the evidence shows that the failure to detect the particular injury that is the root of Mr. March's

34

current physical condition, through a careful inspection of the bowel, is a deviation from the standard of care.

### C. Causation

A plaintiff alleging medical malpractice in Connecticut must also "establish a causal relationship between the physician's negligent actions or failure to act and the resulting injury by showing that the action or omission constituted a substantial factor in producing the injury." *Edwards*, 240 Conn. at 615. "[T]o meet this requirement, the plaintiff must generally show that the defendant's negligent act or omission was a 'but for' cause of the injury, that the negligence was causally linked to the harm, and that the defendant's negligent act or omission was proximate to the resulting injury." *Allen*, 472 F. Supp. 2d at 209 (citing *Zuchowicz*, 140 F.3d at 388).

#### i.  Cause in Fact

Plaintiffs argue that during the removal of adhesions during the laparoscopic ventral hernia repair procedure, "Mr. March suffered a thermal injury to his small bowel." Pls.' Post-Trial Findings ¶ 19. Defendant argues that Plaintiffs have not proven by a preponderance of the evidence that Mr. March suffered a thermal injury to his small bowel during the procedure. Def.'s Post-Trial Findings at 2. Instead, Defendant argues that Dr. Suede created a perforation during his first exploratory laparotomy on June 23, 2015, which was the same perforation described by pathology on June 26, 2015. *Id.* at 3.

The Court disagrees.

Both physicians who performed the laparoscopic ventral hernia repair procedure, Drs. Schlessel and Lujic, testified that it was a possibility – if not a probability – that it was likely that Mr. March suffered an undetected injury during the procedure. *See* Tr. 112:9-20, 113:24-21 (Dr.

Lujic) ("Q: Do you agree, Doctor, that it's likely that Mr. March suffered a bowel injury during this surgery that you performed? A: Presumably, yes. Presumably, yes."); *id.* 250:21-251:3 (Dr. Schlessel) ("Q: So anyway, his presentation to Manchester Memorial Hospital on June 23, which is eight days post op – A: Yes. Q: -- is consistent with a burn injury that developed into a through-and-through perforation from the June 15th surgery? A: Yes, it's a possibility."); *id.* 252:22-253:6 (Dr. Schlessel) ("Q: You agree that the most likely explanation for Mr. March's presentation was an undiagnosed injury to his bowel during the surgery on June 15th? A: I always blame myself first, yes. So I have to think that there was a relationship. Q: Okay. A: Until proven otherwise. With that being said, it also – you know, the bowel is scrutinized, you know, and I was quite sure that there wasn't one.").

Dr. Schlessel further testified that burn injuries can take several days for the injury to become a through-and-through bowel perforation, and that the symptoms could progress to life-threatening peritonitis if they were missed, *id.* 249:12-250:8, and that his presentation to Manchester was possibly consistent with a burn injury that developed to a through-and-through perforation during the laparoscopic ventral hernia repair procedure, *id.* 250:21-251:2. Defendants' argument that Drs. Schlessel and Lujic's testimony is not probative of causation because Drs. Lujic and Schlessel were not familiar with Mr. March's care at Manchester, and relied only on statistics, is unavailing for several reasons.

Both Drs. Lujic and Schlessel testified that although they had not read the Manchester records and were not aware of the operative findings once Mr. March had presented there, *see id.* 143:22-144:4, 241:12-15, they were both aware at the time of their testimony that Mr. March had presented to Manchester with a diagnosis of perforated bowel and peritonitis, *see id.* 207:18-22, 114:15-18, which at least, in part, informed their belief that an undetected thermal injury had

occurred during the laparoscopic ventral hernia repair procedure. And though in Connecticut, "[t]he expert opinion that seeks to establish the causal connection between the injury and the alleged negligence must rest upon more than surmise or conjecture," *Shelnitz v. Greenberg*, 200 Conn. 58, 66 (1986) (internal quotation marks omitted), Defendant offers no authority for its position, even if true, which the Court does not so conclude, that Drs. Schlessel and Lujic's reliance on statistics, or probability, coupled with their experience as treating physicians, is insufficient to permit the Court to weigh these opinions.[12]

Moreover, Drs. Schlessel and Lujic performed the procedure, which gives them direct involvement with the operation that allegedly was the root cause of Mr. March's injury. Drs. Schlessel and Lujic could have, as surgeons whose qualifications Defendant did not at trial question or attempt to discredit, indicated they were unable to answer questions about the likelihood of occurrence of thermal injury without reviewing the Manchester records or testified they would need to see such records to offer such an opinion. Neither physician offered such a caveat to their statements, nor did Defendant object to Drs. Schlessel or Lujic offering such an opinion or inquire as to their basis for these beliefs.

Finally, Defendant's argument goes to the weight, not admissibility, of the testimony of Drs. Schlessel and Lujic on the issue of causation. *See Milliun v. New Milford Hosp.*, 310 Conn. 711, 732-33 (2013) (finding, in medical malpractice case where expert witnesses "concluded that they had sufficient, reliable information to diagnose [a] condition and the cause of that condition," that although "there may be other possible causes that the physicians did not

---

[12] Though Defendant cites to Dr. Smith's testimony purportedly to support its argument that "statistics alone do not a diagnosis, or treatment plan, make," Def.'s Post-Trial Findings at 62-63 ¶ 21 n.32, this argument does not properly characterize Dr. Smith's testimony and the nature of the role Drs. Schlessel and Lujic played in the surgery. Dr. Smith agreed that in treating a patient, a physician cannot rely "only on statistics," and that a physician would also attempt to learn specific things about a patient's condition, but also stated that statistics "frequently guide" a physician's decisionmaking process. Tr. 414:18-415:4. Drs. Schlessel and Lujic also, of course, knew "specific things" about Mr. March's condition, given that they performed the laparoscopic ventral hernia repair procedure.

consider, such matters go to weight, not admissibility"); *see also Struckman v. Burns*, 205 Conn. 542, 554 (1987) ("The causal relation between an injury and its later physical effects may be established by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question." (emphasis omitted)); *Eisenbach v. Downey*, 45 Conn. App. 165, 176, *cert. denied*, 241 Conn. 926 (1997) (concluding that defendants' arguments that lower court improperly admitted medical reports to establish causation because these reports did not consider plaintiffs' prior injuries as potential causes went to weight and not admissibility).

Even if the Court were to conclude that the causation testimony of Drs. Schlessel and Lujic is weaker because that they did not review the Manchester records, the Court declines to find it not probative and considers it alongside the other record evidence on this issue.

Dr. Suede, the treating physician at Manchester on June 23, 2015, also testified that he believed the laparoscopic ventral hernia repair procedure caused the perforation which led him to seek care at Manchester. Tr. 37:14-38:11. Dr. Suede testified that he knew he had not caused the perforation because "immediately when [he] opened the incision," he saw bowel contents free in the abdominal cavity. *Id.* 38:12-20. Though, at his deposition, he agreed with the statement that he could not rule out the possibility that he caused the small bowel hole during the June 26, 2015 surgery, he maintained at trial that he could not have created the perforation during the June 23, 2015 exploratory laparotomy. *Id.* 65:3-66:10. He testified further that when Mr. March arrived at Manchester on June 23, 2015 he was "in extreme pain," and Dr. Suede thought that it was "obvious on his physical exam," "obvious on his condition," and "obvious on the CAT scan we did" that there was a perforation in the bowel. *Id.* 69:11-70:2. The perforation was there, Dr. Suede testified, "before [he] touched [Mr. March] on June 23rd." *Id.* 70:3-15. While Dr.

Novitsky testified credibly that Dr. Suede's examination of the bowel could in theory have caused a perforation, *see id.* 545:12-21, this does not explain Mr. March's initial presentation with extreme pain before Dr. Suede operated on him.

Dr. Novitsky, who reviewed all of the relevant medical records, including the records from Manchester, provided a differential diagnosis,[13] and testified that "there is no one diagnosis that is fully supported by the facts of this case," and that he "struggled to present one definitive etiology and sort of causation to this case." *Id.* 528:3-14. He testified that the possibilities of where Mr. March's injury could have arisen were (1) an unrecognized enterotomy, or perforation, of the small bowel; (2) enterotomy as a result of a thermal injury to the small bowel; and (3) a spontaneous perforation of the large bowel, or the colon. *Id.* 533:4-21. He noted that Dr. Suede's examination on June 23 had not revealed any perforation. *Id.* 534:22-535:5. He also noted that the June 26 pathology report did not indicate any "necrosis or other cellular features that would have been consistent with a prior burn-induced necrosis of the area and resulting in perforation." *Id.* 541:18-542:14. He opined that the injury "may have happened spontaneously or may have been caused on the 23rd by Dr. Suede's careful inspection."[14] *Id.* 544:2-10. He testified that to produce the large amount of fluid Dr. Suede saw on June 23, he would have expected to see a larger hole, "or any hole." *Id.* 549:22-25.

On cross-examination, however, Dr. Novitsky agreed that a thermal injury to the bowel during the laparoscopic ventral hernia repair procedure most likely explained Mr. March's presentation to Manchester. *Id.* 559:19-25; *see also id.* 572:6-10 ("Q: With respect to those three

---

[13] "A differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the 'most likely' cause of a set of signs and symptoms from a list of causes." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (internal quotation marks omitted).

[14] The Court finds this testimony admissible and probative because, although Dr. Novitsky used the word "may," he was describing his prior-conducted differential diagnosis, which set forth these potential outcomes.

possibilities, spontaneous small bowel, spontaneous colon, and thermal injury, thermal injury is the most likely, right? A: Yes."). He also confirmed that a spontaneous perforation of the small bowel is a "rare event." *Id*. 560:5-8. As to the spontaneous perforation of the colon, Dr. Novitsky agreed that for this injury to have occurred, the colon would have had to have perforated, leaked enough to cause him to become sick, and then again become undetectable. *Id*. 569:9-14. He testified that a colonic injury could have been "hidden," and could have been likely to become sealed anatomically, or naturally, over time. *Id*. 568:5-14. He agreed that the Gastrografin enema was ordered by Dr. Suede to check the status of the colon, and the Gastrografin enema came back negative, with no evidence of a leak. *Id*. 569:25-570:8. He testified, however, that Gastrografin enemas can result in false negatives, which could "render the test . . . normal, when there is still a perforation." *Id*. 539:1-13.

Dr. Smith testified "with a great deal of certainty" that "the intraabdominal sepsis and contamination found by Dr. Suede on the 23rd was the result of a bowel injury that had occurred during the laparoscopic hernia repair performed on the 15th." *Id*. 390:5-9. He testified that "the most likely cause . . . [was] an unrecognized thermal injury to the bowel that evolved, lost its structural integrity and perforated causing enteric contents to enter the peritoneal cavity outside the bowel wall." *Id*. 390:10-17. As to a spontaneous perforation of the bowel, he testified that this would be "exceedingly rare," indeed, "a case reportable in the medical literature if that actually occurred." *Id*. 391:17-392:10. Defendant's suggestions that Dr. Smith's testimony is not credible or persuasive because he failed to explain precisely how or when the alleged thermal injury progressed to a perforation and caused bowel leakage, he allegedly assumed "without evidence" that Dr. Suede's findings on June 23 were consistent only with a small bowel injury, and he never explained how the perforation found by pathology on June 26 was consistent with

the cellular death necessarily resulting from a thermal injury, *see* Def.'s Post-Trial Findings at 54 ¶ 5, are not persuasive.

As to a spontaneous perforation of the colon, Dr. Smith testified that such a hole could seal, *id.* 411:14-17, 414:2-5, and that Gastrografin enemas could result in false negatives, *id.* 418:3-14, but also testified that the probability of a spontaneous perforation of the colon in this case was "zero," *id.* 392:19-25. As Dr. Smith testified, that probability was "zero, in [his] opinion, for several reasons," in particular that Mr. March had "had previous colon resection for the distinct purpose of removing the area of his bowel involved with diverticular disease," which had "remove[d] the lion's share of diseased bowel"; that the negative result of the Gastrografin enema, meant to "look[] for any pathology in the colon that would be responsible for enteric contamination" had "showed no leakage from the bowel, the colon"; and that there was a subsequent injury identified to the small bowel. *Id.* 392:25-393:23.

Dr. Smith also testified that the probability, in his opinion, that Dr. Suede had caused a hole in the colon that self-sealed and later ruptured, was similarly "zero." *Id.* 469:17-23. Dr. Smith, for his part, reviewed both the VA records and records from Mr. March's treatment at Manchester, *id.* 424:24-425:2, 426:2-8, and after reviewing the pathology report, Dr. Smith opined that the perforation stemmed from a "thermal injury to the bowel," though he did not say at that point when such a thermal injury had likely occurred, *id.* 440:25-441:2. Dr. Smith also explained how a burn injury may progress to a perforation as the tissue liquefies and breaks down. *See id.* 377:5-23, 390:5-17, 405:10-406:20.

Defendant argues, based primarily on Dr. Novitsky's testimony, that because "Mr. March's history of diverticulitis, persistent findings of diverticula, recent surgery, pain medicine and constipation[] were all factors that could have led to a spontaneous colonic rupture," Def.'s

Post-Trial Findings at 63 ¶ 24, and Dr. Suede's ordering of a Gastrografin enema "suggest[s] Dr. Suede was concerned about a colon injury," *id.* 64 ¶ 25, as well as that the type and amount of fluid found in the CT scan indicated the fluid may not have come from the small bowel, *id.* ¶ 27, "there is insufficient evidence to either fully support nor refute the differential etiology that Mr. March had suffered a spontaneous colonic perforation of a diverticulum between [June 20] and [June 23]," *id.* 66 ¶ 39.

The Court disagrees.

Taken together, the testimonies of Drs. Smith and Novitsky make clear that although a spontaneous perforation to the colon could, in theory, perhaps have occurred – though Dr. Smith testified this probability was zero – this possibility is significantly more remote than a thermal injury, given that this would have required the colonic perforation to have occurred in the small percentage of the diseased colon that Dr. Suede was unable to remove; the injury to self-seal such that it was undetectable; and the Gastrografin enema to have returned a false negative, each an event apparently unlikely to occur on its own and even less likely to occur in tandem.[15]

---

[15] Defendant argues that because the June 26 pathology report did not explicitly describe necrotized tissue, this necessarily "means that it was *not* there," because "[p]athologists at Manchester Hospital were perfectly capable of writing a pathology report that identified necrotic tissue." Def.'s Post-Trial Findings at 70 ¶¶ 12-13 (citing Ex. 5 at 3859, a pathology report describing necrotic tissue). Dr. Novitsky testified that "[i]t was significant to [him] that . . . the pathologist did not mention any evidence or other cellular features that would have been consistent with a prior burn-induced necrosis of the area and resulting in perforation," Tr. 542:9-14, and noted that "significant" burn injuries "can proceed to full thickness injury, and those typically will result in tissue necrosis and perforation," *id.* 504:7-13. Dr. Smith, however, testified that he did not agree with the statement that "[f]or a burn injury to progress from a burn at the serosal layer to an enterotomy there must be through-and-through necrosis of tissue," *id.* 406:21-25, though Dr. Suede testified that he agreed with the statement that "[f]or a thermal injury to become an enterotomy requires that the tissue become necrotized through all three layers of bowel," and he did not see necrotic tissue in either of his surgeries, *id.* 63:20-64:2. There was insufficient expert testimony, however, as to the specifics of how pathology reports are prepared or what is normally included in such reports, such as whether "necrotic" tissue, if observed, would in the normal course be mentioned, or if the absence of the word "necrotic" in a report would indicate that it was not observed. Indeed, Defendant's absence of necrotic tissue argument is undercut by Defendant's insistence elsewhere, that the fact that a final inspection was not explicitly mentioned on the post-operative note does not necessarily mean that such an inspection did not occur. *See, e.g.*, Def.'s Post-Trial Findings at 17-18 ("[Dr. Schlessel] did not believe the final inspection of the bowel needed to be memorialized in the operative report."). In any event, even if necrotic tissue were absent from the pathology findings, this does not

(Continued . . . )

Accordingly, given the agreement between Drs. Novitsky and Smith that the proffered alternative causes, such as a spontaneous perforation of the colon or bowel, would be exceedingly rare; the testimony of Dr. Smith that the condition underlying Mr. March's presentation to Manchester on June 23 was almost certainly caused by a thermal injury during the laparoscopic ventral hernia repair procedure; the testimonies of Dr. Lujic and Schlessel that they believed it to be possible, if not probable, that a thermal injury occurred during the laparoscopic ventral hernia repair procedure; and the testimony of Dr. Lujic that an injury of some kind likely occurred during the laparoscopic ventral hernia repair procedure, on this record, it is more likely than not that a thermal injury occurred during the laparoscopic ventral hernia repair procedure that caused Mr. March to present to Manchester on June 23 with peritonitis and requiring multiple surgical interventions.[16]

### ii.  Proximate Cause

"All medical malpractice claims, whether involving acts or inactions of a defendant physician, require that a defendant physician's conduct proximately cause the plaintiff's injuries." *Sargis v. Donahue*, 142 Conn. App. 505, 513, *cert. denied*, 309 Conn. 914 (2013). In

---

outweigh the conclusion, as discussed above, that under the preponderance of the evidence standard, it is more likely than not that a thermal injury occurred during the laparoscopic ventral hernia repair procedure.

[16] Defendant argues that the doctrine of *res ipsa loquitor* is not applicable to this case because here, "in the ordinary course of events an undetectable injury might have occurred even during the exercise of reasonable care." Def.'s Post-Trial Findings at 43 ¶¶ 5-6. "The doctrine of res ipsa loquitor, literally the thing speaks for itself, permits a jury to infer negligence when no direct evidence of negligence has been introduced." *Boone v. William W. Backus Hosp.*, 272 Conn. 551, 575 (2005). The Court does not address the question of *res ipsa loquitor* because, as discussed above and below, the Court finds that there is evidence that Drs. Schlessel and Lujic breached the standard of care. Moreover, even if the Court accepts as true Defendant's contention that "[i]n the exercise of reasonable care, a surgeon may fail to identify a thermal injury during a [laparoscopic ventral hernia repair procedure]," Def.'s Post-Trial Findings at 43 ¶ 7, there is insufficient evidence on the record to conclude that in Mr. March's case, his injury would not have been detected upon a final inspection in accordance with the standard of care. *See* Tr. 470:24-471:6 (Dr. Smith) ("The Court: Okay. And so if they had done . . . the final check, they would have seen the injury? I just want to be clear. A: Yes, your honor, I believe if they had done a complete examination of the small bowel before closing, in all likelihood they would have identified that thermal injury."); *id.* 147:4-8 (Dr. Lujic) ("So if the surgeon who is doing the surgery and doing the inspection of the bowel is as careful as the standard of care requires him or her to be, the chances of missing an injury are almost absent? A: Very minimal.").

Connecticut, "the test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries." *Barnes v. Conn. Podiatry Grp., P.C.*, 195 Conn. App. 212, 241 (2020) (quoting *Ward v. Ramsey*, 146 Conn. App. 485, 490-92, *cert. denied*, 310 Con. 965 (2013)) (alterations omitted). "The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection." *Id.* (quoting *Ward*, 146 Conn. App. at 492). "The inquiry fundamental to all proximate cause questions . . . [is] whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence." *Id.* (quoting *Ward*, 146 Conn. App. at 492). "A plaintiff, however, 'is not required to disprove all other possible explanations for the accident but, rather, must demonstrate that it is more likely than not that the defendant's negligence was the cause of the accident.'" *Arroyo v. Univ. of Conn. Health Ctr.*, 175 Conn. App. 493, 515 (2017) (emphasis omitted) (quoting *Rawls v. Progressive Northern Ins. Co.*, 310 Conn. 768, 782 (2014)).

Plaintiffs argue that proper inspection would, more likely than not, have detected the thermal injury in Mr. March's bowel. *See* Pls.' Reply at 6. Defendant argues that Plaintiffs have not proven that failing to run the bowel at the end of the procedure was a proximate cause of failing to prevent the alleged injury. Def.'s Post-Trial Findings at 2. In Defendant's view, failing to run the bowel after placing the mesh, or at the end of the procedure, was not a substantial factor in failing to detect and repair the presumed thermal injury. *Id.* at 52 ¶ 8.

The Court agrees with Plaintiffs.

Though, as Defendant notes, *see* Def.'s Post-Trial Findings at 52 ¶¶ 6-8, Dr. Novitsky credibly testified that it would be very unlikely for a new electrocautery injury to occur to the bowel while placing mesh, or after placing mesh, *see id.* 510:24-512:2, and that he believed it

was proper not to run the bowel again at that stage "[b]ecause [he] ruled out injury already prior to placing the mesh," *id.* 512:3-9, Dr. Novitsky's testimony does not address whether a final inspection of the bowel, had it been conducted by Drs. Schlessel and Lujic, would – more likely than not – have resulted in detection of the thermal injury to Mr. March's bowel. Dr. Novitsky's testimony is silent as to whether an injury that occurred earlier in the operation – during the lysing of adhesions – would have been more likely than not detected upon a thorough final examination of the bowel.

Dr. Smith, however, testified that a careful, thorough inspection in compliance with the standard of care would have detected the thermal injury to Mr. March's bowel. *Id.* 394:18-23. He "believe[d] that [Drs. Schlessel and Lujic] deviated from the standard of care by not performing that third or last inspection of the small bowel prior to closing," and "[w]ith a very high degree of accuracy, injuries to the bowel can be identified before closing." *Id.* 390:24-391:3. He opined that "[h]ad that injury been identified, again it's a fairly straightforward endeavor to repair the injury," and "the delayed perforation and delayed contamination and sepsis would have been prevented." *Id.* 391:3-6. He opined that this failure was "the key factor in the subsequent problems that developed," namely, Mr. March's peritonitis, sepsis, subsequent operations, wound healing issues, and loss of abdominal wall musculature. *Id.* 391:8-16.

Dr. Schlessel, who agreed that the standard of care requires a final inspection before the abdomen is desufflated, *id.* 259:22-25, also agreed that a perforation that is not detected can have catastrophic consequences for a patient, *id.* 195:18-20, and that burn injuries, if undiagnosed, could progress over the course of several days to a complete perforation of the bowel wall, *id.* 199:21-25. He agreed further that the final inspection was "important" because there was always a chance that once the bowel is free, there is a chance a surgeon might have missed an injury. *Id.*

197:1-16. He agreed that an inadequate inspection could possibly lead to a missed injury, and that if a surgeon isn't careful or thorough in his inspection, an injury may be missed. *Id*. 208:19-209:6. He also testified, however, that though he felt badly there was a complication from Mr. March's laparoscopic ventral hernia repair procedure, and that he "wish[ed] [he and Dr. Lujic] had looked at the bowel more, . . . eventually you get to a point where, you know, you can't obsess, you have to move on." *Id*. 244:24-245:13.

Dr. Lujic agreed that a careful, thorough inspection should uncover any injuries to the bowel. *Id*. 110:22-24. He agreed that, if a burn injury had resulted from the laparoscopic ventral hernia repair procedure, either he didn't look at the area of bowel that was injured or he looked at the area and did not see the injury. *Id*. 118:3-7.

While Defendant argues that any alleged failure to conduct a final inspection could not be the proximate cause of any injury because no inspection could not have detected this injury, Def.'s Post-Trial Findings at 53 ¶ 10, that argument cannot be sustained on this record. There is ample testimony that some burn injuries are often undetectable, *see, e.g.* Tr. 442:4-8, 582:12-20, but not enough in this record to conclude that Mr. March's particular burn injury would not have been detectable upon a final inspection of the bowel. And the only expert to weigh in on the specific question of whether this final examination was critical to identify any potentially earlier-missed injuries – Dr. Smith – opined that this step was indeed necessary, and that a careful, thorough inspection done in compliance with the standard of care would likely have resulted in detection of Mr. March's injury. *See id*. 394:18-23.

Indeed, Plaintiffs are not required to prove that the injury would certainly have been detected by this final inspection, only that this failure, a violation of the standard of care as discussed above, more likely than not caused Mr. March's injuries. *See Arroyo*, 175 Conn. App.

46

at 515 (noting that plaintiff "is not required to disprove all other possible explanations for the accident but, rather, must demonstrate that it is more likely than not that the defendant's negligence was the cause of the accident.") (citations and internal quotation marks omitted)).

Accordingly, it is more likely than not that the failure of Drs. Schlessel and Lujic to conduct a final inspection of the bowel and identify thermal injuries caused the injuries that resulted in Mr. March presenting to Manchester on June 23, and the surgeries and permanent injuries that followed.

### iii.   Contributory Negligence

In Connecticut, comparative negligence is "a viable defense 'in situations where the claim of malpractice sounds in negligence.'" *Teixeira v. Yale New Haven Hosp.*, No. CV9503067S, 2010 WL 1375412, at *2 (Conn. Super. Ct. Mar. 5, 2010) (quoting *Somma v. Gracey*, 15 Conn. App. 371, 378 (1988)) (alteration omitted); *see also id.* at *7 ("In Connecticut, [under] *Somma*, comparative negligence is a valid special defense in medical malpractice actions sounding in negligence, and this defense has been raised effectively in situations where patients have breached their duty of reasonable care during the course of medical treatment . . . ."). Under a theory of comparative negligence in Connecticut, "[a] plaintiff seeking damages allegedly caused by the negligent act of another will not be permitted to recover if it appears that his own wrongful conduct was a proximate cause of the injury to his person or damage to his property of which he complains." *Juchniewicz v. Bridgeport Hosp.*, 281 Conn. 29, 40 (2007) (quoting *LeBlanc v. Grillo*, 129 Conn. 378, 385 (1942)).

Where comparative negligence is alleged, "it shall be affirmatively pleaded by the defendant or defendants, and the burden [of proof] shall rest upon the defendant or defendants." *Id.* at 36 (quoting Conn. Gen. Stat. § 52-114); *see also* Practice Book § 10-53 (requiring the

defense of contributory negligence to be specially pled). "[A]ny economic or noneconomic damages allowed shall be diminished in proportion of the percentage of negligence attributable to the person recovering." *Somma*, 15 Conn. App. at 372 (quoting Conn. Gen. Stat. § 52-572h(b)).

Defendant argues that Mr. March was contributorily negligent, "though less than 51% negligent, for not seeking medical care earlier during the time" between his discharge from the VA and before his presentation to Manchester, and argues that his damages should be reduced proportionally by his share of negligence. Def.'s Post-Trial Findings at 71 ¶ 1. According to Defendant, the record evidence shows that Mr. March's pain was well-controlled when he was discharged from the VA and that he was told to contact his physician if his pain worsened, *id.* ¶ 2; that by the time Mr. March presented to Manchester, his body had been leaking fluid for 24 hours, *id.* ¶ 3; that his testimony that he first had a fever on June 23 is not credible, *id.* 72 ¶ 6; and that the record is contradictory as to whether Mr. March was actually in pain when he presented to Manchester, *id.* ¶ 7. As to the June 23 phone call Mr. March had with the VA, Defendant argues that Mr. March's testimony at trial that, during the call, the VA informed Mr. March he would need to wait three to four hours to be seen, was inconsistent with his earlier descriptions of that call to his medical providers. *Id.* at 72-73 ¶ 8. Finally, Defendant argues that Mr. March's medical records show that on June 23, he believed he only needed an antibiotic. *Id.* 74 ¶ 9.

The Court disagrees.

As the Court earlier found, the record shows that Mr. March's pain was well-controlled by the time he was discharged from the VA, *see* Ex. 2 at 125, that Mr. March was prescribed pain medication, *id.* at 105, and that he was told to call his physician if his pain got worse while

he was taking pain medicine, Ex. 3 at 687. There is also evidence that Mr. March's pain was at a "10" after discharge, *see* Tr. 295:1-9, which he echoed on the phone with a VA nurse on June 22, *see* Ex. 2 at 103. Leaving aside the question of whether, when, and how Mr. March's pain actually increased after discharge – which Defendants have not proven[17] – Defendant has offered insufficient evidence either in general, as to the standard of "reasonable care" that Mr. March was required to exercise or, more specifically, whether any such failure to notify a physician in the two days between June 20 and June 22 either was a violation of this reasonable care, or would have caused or exacerbated the injuries he later suffered. *See Juchniewicz*, 281 Conn. at 35 (noting that the defendant has the "burden of proof on the issue of plaintiff's contributory negligence"). Moreover, even if the Court were inclined to reduce the damages award for any such contributory negligence, Defendant has offered no evidence as to the amount or degree to which Mr. March's failure to earlier contact a medical professional would have reduced the likelihood or severity of any injury that followed.

As to Mr. March's alleged failure to contact a physician on June 22, when the fluid in his stomach allegedly began to accumulate, *see* Def.'s Post-Trial Findings at 71 ¶ 3, while the June 22 phone call with the VA nurse shows that the nurse believed Mr. March "[was] not following the proper dosing of his pain medication," Ex. 2 at 103, it does not indicate whether Mr. March

---

[17] While, as discussed in the Court's findings of fact, the Court finds more accurate Mr. March's June 19 statement that he reported a 2/10 in pain level, rather than his testimony at trial that the pain was always a 10, Defendants have offered no proof as to how Mr. March's pain progressed from June 20 to June 23, when he presented to Manchester. And while Defendants allege that Mr. March's testimony with respect to the progression of his symptoms, such as his testimony that he first had a fever on June 23, is inconsistent with the record, such as Manchester's records showing that he denied any history of fever, *see* Def.'s Post-Trial Findings at 72 ¶¶ 6-7 (citing Ex. 5 at 2062, 2115), Defendants do not make any claim as to how these inconsistencies, even if true, show that Mr. March was contributorily negligent. In other words, even if Mr. March had not suffered a fever on June 23, it is undisputed that he contacted the VA on June 23 to complain that his body was "swollen and leaking fluid," *see* Ex. 2 at 96, and that he arrived at Manchester in need of an emergency operation, *see, e.g.*, Tr. 19:1-7 ("Q: And why was it an emergency, Doctor? A [(Dr. Suede)]: This condition that he came in with, it's a life[-]threatening condition, and the surgery is considered life[-]saving at that time. . . ."). Similarly, Defendant's assertion that on June 23, Mr. March "believed he only needed an antibiotic," Def.'s Post-Trial Findings at 74 ¶ 9, fails for the same reasons.

was over- or under-dosing and, in fact, elsewhere states that "he is taking his oxycodone every 3 hours and may need more if the pain persi[sts]," *id.* Moreover, Mr. March informed the VA during the call, according to the call notes, that he remained "in pain" and had a "swollen" abdomen. *Id.* While the VA nurse noted that they would "alert surgeon and PCP [(primary care provider)]," as well as the "team," the VA nurse, according to the call notes, did not advise Mr. March to return to the hospital, but rather, to wait until "an app[ointment] with his PCP next week July 1[]," and that his letter outlining complaints "can wait as [he] kept just going over and over with so many complaints." *Id.* Therefore, as Mr. March spoke to the VA and mentioned he continued to be in pain, despite taking pain medication, but, on the record, was not told to return to the hospital, Defendant's argument that Mr. March was contributorily negligent for failing to seek medical care as early as June 22, *see* Def.'s Post-Trial Findings at 71 ¶ 3, is unavailing.

Accordingly, the Court concludes that Defendant has not satisfied its burden of proof to successfully assert a defense of contributory negligence and turns to an assessment of damages.

### D. Damages

#### i. Economic Damages

The parties agree that in a medical malpractice action such as this, the plaintiff is entitled to "receive fair, just, and reasonable compensation for all injuries and losses, past and future, proximately caused by the defendant's proven negligence." Pls.' Post-Trial Findings ¶ 29; Def.'s Reply at 11. The parties further agree that Plaintiffs bear the burden of proving both the nature and extent of each particular loss or injury and that the loss or injury in question was proximately caused by the defendant's negligence, and that injuries and losses for which the plaintiff should be compensated include those he has suffered up to and including the present time and those he is reasonably likely to suffer in the future as a proximate result of the defendant's negligence.

Pls.' Post-Trial Findings ¶ 29; Def.'s Reply at 11. The parties also agree that economic damages may be awarded as compensation for monetary losses and expenses which the plaintiff has incurred, or is reasonably likely to incur in the future, as a result of the defendant's negligence, and may be awarded for such things as the cost of reasonable and necessary medical care and lost earnings, and that noneconomic damages may be awarded for non-monetary losses and injuries, such as physical pain and suffering, mental and emotional pain and suffering, and loss or diminution of the ability to enjoy life's pleasures, that plaintiff has suffered or is reasonably likely to suffer in the future. Pls.' Post-Trial Findings ¶ 30 (citing *Tuite v. Stop & Shop Cos.*, 45 Conn. App. 305, 310-11 n.2 (1997)); Def.'s Reply at 11.

Plaintiffs, through the testimony of expert witnesses Dr. Crakes and Ms. Carruthers, presented an estimate of the economic damages Mr. March incurred as a result of the VA's negligence. Ms. Carruthers, a life-care planner, analyzed Mr. March's future cost of care, including medical and rehabilitative care, equipment and assessments as a result of the injuries he suffered. *See* Tr. 606:12-609:10. In preparing her life-care plan, Ms. Carruthers reviewed Mr. March's medical records, spoke with Mr. March's physicians, Dr. Waddington and Dr. Matthews, as well as Mr. and Mrs. March, *see id.* 609:23-612:13, and identified the costs for the recommended services and equipment, *see id.* 613:20-615:9.

Dr. Crakes calculated the present value of Ms. Carruthers's future cost of care plan in part by considering each value in the life care plan, excluding any value listed as "as needed," or "if needed," and using the midpoint of the recommended range of frequency for any such service provided in the report. *See id.* 689:16-691:3. He also calculated Mr. March's statistical life expectancy, based on government tables, to be 37.97 at the time of his injury. *Id.* 691:4-21. He then applied a calculated discount rate, taking into account the rate of growth and the cost of

51

care. *Id.* 692:14-25. Dr. Crakes calculated that the present value of Ms. Carruthers' future cost of care plan was $2,093,930. *Id.* 694:22-23.

As to the loss of earning capacity, Dr. Crakes performed two separate sets of calculations: one that presumed Mr. March would work until he was age 65; another that presumed he would work until age 70. *Id.* 679:3-13. For each potential age of retirement, Dr. Crakes performed two sets of calculations, or earning alternatives: one that assumed Mr. March would make $86,000 a year, and one that assumed he would make $54,356 a year. *Id.* 682:22-683:16. Dr. Crakes based his selection of the $54,356 number on Mr. March's mean annual earnings from 2012 to 2014. *Id.* 680:4-10. He based his selection of the $86,000 annual salary on the fact that at the time of his injury, Mr. March had recently established an employment relationship in a contract that provided a $60,000 base salary, with $500 per week for commissions from sales. *Id.* 679:19-680:3.

For each calculation, Dr. Crakes applied a rate of growth based on trends of workers on average nationwide, as well as assumed that, based on Mr. March's age, assumed that his earnings increases per year would be one percent lower than the discount rate. *Id.* 684:2-24. He then applied a deduction for federal and state tax liability. *Id.* 685:9-22. After completing these calculations, Dr. Crakes determined that with base earnings of $54,356 annually, the loss of earning capacity to age 65 is $1,243,683, and the loss of earning capacity to age 70 is $1,465,523; he determined further that with a base earning of $86,000 annually, the loss of earning capacity to age 65 is $1,871,922, and the loss of earning capacity to age 70 is $2,210,339. *Id.* 686:22-688:16.

With respect to Dr. Crakes' estimate of the future cost of care, based on Ms. Carruthers's life care report, Defendant makes a series of arguments to attempt to limit or discount portions of

the report.[18] Specifically, Defendant argues that for several items recommended by Ms. Carruthers, these recommendations came from Mr. March's (non-testifying) physicians, and not her expertise, Def.'s Post-Trial Findings at 76 ¶ 2 – 77 ¶ 4; that Ms. Carruthers' recommendation for psychological treatment was based, in part, on Mr. March's "abandoned" diagnosis of PTSD, *id.* at 77 ¶ 5; that Ms. Carruthers is not a qualified expert in the psychological treatment field and did not consult with a mental health provider in developing her recommendations, *id.* ¶ 6, and that in any event, Mr. March has not proven that he will utilize those services, *id.* 77-78 ¶ 7; that Mr. March has not proven he will actually require use of certain equipment, such as a reclining bed and chair, overhead bed bar, and bathroom modifications, *id.* 78-79 ¶ 9; and that Mr. March is a candidate for a reversion surgery, which could mitigate against certain damages, *id.*

Defendant therefore argues that the Court should not credit claims for services not prescribed to Mr. March, such as gastroenterological medical evaluations, any therapies in the amounts prescribed, except occupational therapies, and referrals to pain clinics. *Id.* 79 ¶ 11. Defendant urges the Court to subtract from the future discount cost of care "any items that plaintiffs did not prove with sufficient credible, and timely disclosed evidence." *Id.* 81 ¶ 17.

As an initial matter, most if not all of Defendant's arguments fail because it has offered no competing expert testimony to mitigate against Ms. Carruthers's conclusions. In other words, Defendant's speculation about what Mr. March will and will not need – arguments based, as Defendant admits, only on counsel for the Defendant's review of the medical records, *see* Def.'s Post-Trial Findings at 78 ¶ 8 – cannot, without more, outweigh Ms. Carruthers's expert testimony. *See, e.g., Oram*, 2008 WL 4984752, at *12 (finding the testimony of a life-care planner admissible because the planner "is clearly an experienced expert in what care is needed

---

[18] For sake of expediency, the Court does not restate the arguments made by Defendant that overlap with those made in their motion *in limine*.

by a severely disabled person," and "reviewed his report with medical doctors and based his evidence in part on what care and treatment had been and was being provided to [the injured party] with the approval of [the party's] health care providers").

Indeed, Defendant has offered insufficient authority for the proposition that because Ms. Carruthers based her report on non-testifying treating physicians of Mr. March's, this renders her testimony invalid. *See* Def.'s Post-Trial Findings at 76 ¶ 2 – 77 ¶ 4. Courts in Connecticut have credited the testimony of life care planners who "reviewed [their] report with medical doctors and based [their] evidence in part on what care and treatment had been and was being provided . . . with the approval of . . . health care providers." *Oram*, 2008 WL 4984752, at *12 (also noting that "[t]he court is not aware of any requirement that testimony in this area can only be provided by a medical practitioner").

Defendants also offer no authority, expert testimony, or any evidence other than speculation for the proposition that because Mr. March previously had access to mental health counseling and chose not to continue, or may have expressed that he did not need mental health counseling, projections for future mental health care should not be included in a life care plan. *See* Def.'s Post-Trial Findings at 77-78 ¶¶ 6-8. Even if Mr. March may not currently need "help getting out of bed, getting dressed, showering or walking," *id.* at 78-79 ¶ 9, that fact does not mean that he will not require such services in the future.

Accordingly, Plaintiffs have sufficiently proved that they are entitled to damages in the amount of $2,093,930 for the future cost of care.

As to Mr. March's lost future earnings, *see* Def.'s Post-Trial Findings at 75 ¶ 1 – 76 ¶ 10, Defendants argue that: (1) Mr. March's average earnings from 2003-2014, excluding the years he reported $0 in earnings, was $42,433, and that Dr. Crakes's decision to use the years of 2012-

2014 for his $54,356 annual estimate was "arbitrary and speculative," as it was significantly greater than this $42,433 average, *id.* at 75 ¶¶ 1, 4-5; (2) that Dr. Crakes's calculation of lost future earnings based on a salary of $85,000 was similarly "speculative and not supported by Mr. March's actual earnings in any year," and Dr. Crakes's assumption that Mr. March would have received fringe benefits for future employment is "contradicted by his employment history, in which he frequently chose and preferred to be 'self-employed' or to work as a contractor," *id.* 75-76 ¶ 7; and (3) Dr. Crakes's calculation of lost future earnings, based on a base salary of $60,000, was "speculative and not supported by Mr. March's actual earnings," *id.* at 76 ¶ 8.

But Defendant again has not offered any competing expert testimony. In other words, Defendant's arguments about the proper ways in which future earnings projections are calculated, the range of years that should be included in such a calculation, whether recent earnings are more probative of future earnings than previous years, or the likelihood of any individual to earn fringe benefits as part of employment, is based only on counsel for the Defendant's review, and not of any proffered economic expert. These arguments, without more, cannot outweigh Dr. Crakes's qualified expert testimony, especially given Dr. Crakes's significant and accomplished record of preparing such projections. *See* Tr. 672:5-11 (detailing Dr. Crakes's "almost 40 years" of experience in forensic economics); *id.* 673:2-7 (noting Dr. Crakes's bachelor's degree, master's degree, and Ph.D. in economics); *id.* 674:16-22 (discussing Dr. Crakes's membership in seven economic associations); *id.* 676:13-17 (discussing Dr. Crakes's work providing pro bono appraisals of economic loss on behalf of the families of the victims of the World Trade Center attacks through the Victim Compensation Fund run by the United States Department of Justice).

Dr. Crakes's calculations also were not, on the record before the Court, "entirely speculative," as Defendant suggests. *See, e.g.*, Def.'s Post-Trial Findings at 75 ¶ 6. To the contrary, Dr. Crakes thoroughly explained the bases for each of his calculations. *See, e.g.*, Tr: 676:21-677:6 (noting that in conducting his forensic examination, Dr. Crakes "was provided with information concerning the date of birth, date of injury of Mr. March, his educational level, information concerning his income tax returns for a number of years, his social security earnings record, the employment contracts for his employer and his employment at the time of his injury" as well as "various governmental and other statistical reference documents"); *id.* 678:20-24 (explaining Mr. March's statistical life expectancy was calculated "based upon the life expectancy tables from the U.S. Department of Health and Human Services"); *id.* 679:14-680:10 (discussing the reasons for choosing the $86,000 and $54,356 annual figures).

The Court does, however, agree with Defendant that the record shows that Mr. March's annual earnings rarely[19] exceeded $60,000, and his 2012-14 employment was an outlier in his employment history. Def.'s Post-Trial Findings at 75 ¶ 4. At trial, Mr. March agreed that, on paper, he had earned anywhere from a low of $0, in some years, to a high of $60,021. Tr. 329:9-331:1; *see also id.* 334:1-12. And although Mr. March had anticipated earning $86,000 a year during his employment with Victory Energy, *see id.* 330:14-331:19, he also had never actually earned that salary, "because [he] was there less than a year," *id.* 330:20-24, and the company later went bankrupt, *id.* 330:25-331:10. The Court also agrees with Defendant that Plaintiffs have not offered proof that Mr. March would have worked until age 70 sufficient to award damages to that age. Def.'s Reply at 12. Thus, the economic damages based on a base earning of $54,356 per

---

[19] Defendant argues that Mr. March's annual earnings "never" exceeded $60,000, but at trial, Mr. March agreed that he had earned $60,021 in 2013. Tr. 329:23-25.

year and a retirement age of 65 should be discounted by twenty percent, a number more consistent with the broader average earnings estimate of $42,433 for Mr. March.

Accordingly, the Court will award economic damages based on a base earning of $54,356 per year and a retirement age of 65, to award Mr. March $1,243,683 in lost earnings, discounted by twenty percent, for a final total of $994,946.40.[20]

The Court also will award Mr. March $181,401.82 in incurred medical costs as of the time of trial. *See* Pls.' Post-Trial Findings ¶ 31 (citing Ex. 17, Eric March List of Specials with Supporting Bills).

Combined with the $2,093,930 award based on the future cost of care and the $994,946.40 in lost earnings, the Court therefore will award Mr. March a total of $3,270,278.22 in economic damages.

### ii.  Non-Economic Damages to Mr. March

Mr. March also seeks noneconomic damages with respect to his "past and future pain and suffering, scarring, disability, and emotional distress." Pls.' Post-Trial Findings ¶ 37.

### 1.  Standard of Review

Connecticut courts have approved awards of non-economic damages, *see Messier v. United States*, 962 F. Supp. 2d 389, 417 (D. Conn. 2013) (collecting cases from Connecticut state courts), but the burden of proving such noneconomic damages falls on the plaintiff, *see Freeman v. Taylor*, No. KNLCV176031588, 2020 WL 1656203, at *3 (Conn. Super. Ct. Mar. 2, 2020) (citing *Melendez v. Deleo*, 159 Conn. App. 414, 419 (2015)); *see also Expressway Assocs. II v. Friendly Ice Cream Corp. of Conn.*, 218 Conn. 474, 476-77 (1991) (plaintiff, as the party

---

[20] The twenty percent figure is based on the relative difference between the $54,356 per year figure used by Mr. Crakes and the $42,433 per year figure recognized by the Defendant, the latter number being about 80% of the former.

claiming noneconomic damages, has the burden of proving them "with reasonable certainty"). "It is well established that in Connecticut a jury's decision to award economic damages does not trigger, as a matter of law, an automatic award of noneconomic damages." *Melendez*, 159 Conn. at 418. "Under Connecticut law, pain and suffering is a compensable element of personal injury damages 'even which such pain and suffering is evidenced conclusively by the plaintiff's subjective complaints.'" *Powers v. United States*, 589 F. Supp. 1084, 1106 (D. Conn. 1984) (citing *Delott v. Roraback*, 179 Conn. 406, 409 (1980)).

"The size of an award for damages is 'a matter peculiarly within the province of the trial of fact." *Munn*, 24 F. Supp. at 208 (quoting *Mahon v. B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 661 (2007)). "This is particularly true for non-pecuniary awards, where compensation depends upon valuations of imprecise damage components, like the price of loneliness or the cost of despair." *Id.* at 208-09 (citing *Bhatia v. Debek*, 287 Conn. 397, 420 (2008)). In the case of a jury trial, an award for damages for pain and suffering "will be sustained, even though generous, if it does not shock the sense of justice." *Campbell v. Gould*, 194 Conn. 35, 40 (1984) (citing *Camp v. Booth*, 160 Conn. 10, 12-13 (1970)). "Proper compensation cannot be computed by a mathematical formula, and there is no iron-clad rule for the assessment of damages." *Id.* (citing *Lee v. Lee*, 171 Conn. 1, 4 (1976)).

Under the FTCA, an action "shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency" unless "the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts[] relating to the amount of the claim." 28 U.S.C. § 2675(b).

## 2. Discussion

Mr. March's continuing physical challenges are considerable. Mr. March testified that he wears a binder "pretty much 24/7," which pulls his stomach in and helps him breathe. Tr. 315:11-18. He is unable to suck in his stomach. *Id.* 315:24-25. He testified, and the Court observed, that he struggles getting in and out of a chair. *Id.* 316:6-12. He testified that there is never a time where he is comfortable and has no pain. *Id.* 317:7-10. Mr. March's abdominal region is visibly distended. He described the feeling as his stomach "literally swishing around," with his "innards . . . kind of floating around freely." *Id.* 312:17-25. He testified that he is "getting more hernias." *Id.* 315:18. He testified that "balance-wise, . . . [he] used to be able to put on [his] pants and be moving out the door at the same time," but "[n]ow everything is a chore." *Id.* 320:25-321:3. He testified that he "walk[s] downstairs now and [his] legs shake," and he is worried about falling down. *Id.* 322:9-13.

He further testified that before the laparoscopic ventral hernia repair procedure, he would have described his outlook on life as "[a]lways happy, always good, and always looking for a way to . . . overcome and make it happen," *id.* 292:24-293:5, but now he feels "hopeless." *Id.* 323:24-324:3. He testified that he feels like a "burden." *Id.* He testified that before June 2015, he had enjoyed a variety of outdoor activities, such as coaching his children's sports teams, going fishing, going outdoors, and mountain biking. *Id.* 286:3-18. He testified that he was now only able to go to his children's sports games on a limited basis. *Id.* 288:24-289:2.

He testified that his relationship with his wife had changed, because she had gone from being "[his] wife, [his] bride, to home caretaker," and "intimates, they're not there." *Id.* 318:13-17. He testified that it was "nowhere near the same dynamic" as before the surgery. *Id.* 318:20-

21. He testified that he also feels as if he's "let [his children] down" because he "feel[s] like [he] can't participate and help them in areas that [he] normally would be able to." *Id.* 318:22-319:9.

As to his ability to work, he testified that he had not held down a full-time job for any period of time since the procedure. *Id.* 275:2-14. He testified this was because of "reliability" and that he had "tried to maintain a level of consistency with being able to get to sleep at a certain time," but "this," presumably meaning his injuries from the surgery, "doesn't allow [him] to do that." *Id.*

As to his ability to complete household tasks, he testified that he is not able to cook dinner for the family or do laundry, but that he could vacuum and wash windows, *id.* 319:10-320:6. He also testified that he is able to go and pick up groceries, though he requires help putting things away when he gets home. *Id.* 321:14-23. He is able to drive and is comfortable driving "to an extent." *Id.* 292:4-12.

Defendant concedes that Mr. March suffers from his injuries, that "muscle spasms were visible in the courtroom," that "[t]he abdominal binder he must wear is uncomfortable," as is not wearing the binder, and that Mr. March has "suffered diminished hopefulness in the future." Def.'s Post-Trial Findings at 81 ¶ 1. Defendant argues, however, that the Court should discount any noneconomic damages award for several reasons.

First, Defendant argues that Mr. March had not been in good health before 2015, and asks the Court to "discount any claim for loss of enjoyment of life to the extent Mr. March's baseline physical condition posed health risks and loss of enjoyment of life before his [laparoscopic ventral hernia repair]." *Id.* at 82 ¶ 6. Second, Defendant argues that though Mr. March testified at trial that he was "always happy" and "optimistic," his medical records show that he had just before the surgery been stressed about his job situation and been evaluated as "borderline" with

respect to anxiety and depression, which Defendant claims "raises a concern about whether Mr. March testified credibly about his pain and suffering," and should result in the Court discounting any claim to the extent his testimony was not credible. *Id.* ¶¶ 7-8 (internal quotation marks omitted). Third, Defendant argues that Mr. March failed to mitigate his present hernia, muscle problems and other damages by choosing not to undergo an abdominal reconstruction surgery and by not completing exercises prescribed by his PCPs. *Id.* 82-83 ¶ 9. The Court addresses each claim in turn.

As to the argument that Mr. March's baseline physical condition posed health risks prior to the laparoscopic ventral hernia repair procedure, the Court agrees. In 2006, Mr. March was diagnosed with diverticulitis, Tr. 279:11-13, and in 2011, he had an "emergency operation," a sigmoid resection with colostomy, to address perforated diverticulitis, *id.* 7:12-17, which resulted in him wearing a colostomy bag, *id.* 281:4-11. The Court accordingly discounts its award to account for Mr. March's baseline physical condition.

As to the argument that because Mr. March expressed stress about his job situation and may have been diagnosed with anxiety prior to the laparoscopic ventral hernia repair procedure, his testimony that he was "always happy and optimistic" before the procedure raises credibility questions about his pain and suffering, the Court disagrees.

Beyond Mr. March's testimony at trial, there is other evidence of the significant emotional and physical pain and suffering he experienced after the surgery. *See, e.g.*, Ex. 12 at HV001 (medical records from April 8, 2016, discussing his "trauma following hernia repair operation," "mind[] racing at night; always worrying about . . . if I'm going to die," "guilt ('I didn't have to have this operation')," and noting that the "onset [of these symptoms] followed health problems (laparoscopic hernia repair)"); *id.* at HV004 (medical records from May 10,

2016, documenting his complaints that "[b]efore the surgery I was fearless, now I am afraid all the time," and noting that he had "been in counseling since last October for ongoing difficulty . . . following his laparoscopic hernia repair surgery at the VA"); Trial Exhibit 8, records of Dr. Chike Chukwumah ("Ex. 8") at CC005 (medical records from July 11, 2016 discussing Mr. March's decision to defer surgical intervention because he "ha[d] not mentally recovered from his previous surgeries"); *id.* at CC001-002 (April 28, 2016 records noting his limited range of motion and "significant weakness of his hip flexors and multifidus muscles of his back," and the "challenging procedure" that would be needed); Trial Exhibit 9, ECHN records ("Ex. 9") at 6501 (discussing that he "continues to have pain in his abdominals and . . . the surgeon thinks he is unrepairable"); *id.* at 6508-09 (medical records from October 20, 2016 noting that Mr. March sought treatment to prolong his standing tolerance, and that he suffered severe neck and back pain).

Finally, as to Defendant's third argument, that Mr. March failed to mitigate his present problems by choosing not to undergo an abdominal reconstruction surgery and by not completing exercises prescribed by his PCPs, the Court disagrees.

Mr. March's decision not to undergo reconstructive surgery was informed, at least in part, by the fact that he "ha[d] not mentally recovered from his previous surgeries." Ex. 8 at CC005. Dr. Chukwumah stated that this decision was not "unreasonable," *id.* and, as discussed above, had earlier noted that any such procedure would be "challenging . . . to undertake." *Id.* at CC002. Defendants claim that Mr. March's emotional status has changed significantly since 2016 such that he should have reconsidered his decision not to undergo reconstructive surgery, but there is

insufficient evidence on the record to support this assertion.[21] Moreover, in light of the circumstances surrounding Mr. March's laparoscopic ventral hernia repair procedure, the Court also finds reasonable any continued desire to avoid further abdominal surgeries, particularly those that are "challenging." *Id*. The record also shows that Mr. March, at least in 2016, believed that his injuries were "unrepairable." Ex. 9 at 6501.

Defendant points to two specific instances where Mr. March was allegedly not compliant with the exercises and stretches prescribed by his care plan: allegedly on January 2, 2020 and January 13, 2020. Def.'s Post-Trial Findings at 32. On January 2, 2020, providers at ECHN Medical Care Center observed that Mr. March "ha[d] not been compliant with the exercises and stretches recently as we usually work[]out with his kids, but his kids are on vacation," Trial Exhibit 10 ("Ex. 10") at 5152; on January 13, 2020, the provider repeated the same note, *id*. at 5153. Defendant cites no other instances of alleged noncompliance with similar PCP directives; to the contrary, Defendant concedes that Mr. March "did physical therapy and hydrotherapy, with good effect, for years." Def.'s Post-Trial Findings at 32 (citing Ex. 10). The Court sees no reason to reduce any noneconomic damages award on this basis.

As to the proper calculation of noneconomic damages, aside from the question of how and whether to discount such damages, at oral argument, Mr. March seeks a total damages award of the statutory cap under the FTCA, or $15,000,000, which would, given the Court's calculation of economic damages, result in a statutory maximum total noneconomic damages award of

---

[21] It is true, as Defendant notes, that notes from a March 28, 2018 visit to the VA show that Mr. March "report[ed] chronic depression symptoms, however states these are stable and improved from last visit . . . [and] feels as though he has come to terms with his illness (abdominal issues)," Trial Exhibit 4 ("Ex. 4") at 579, and that Mr. March testified at trial that he thought his depression had "stabilized," Tr. at 340:19-22. *See* Def.'s Post-Trial Findings at 31. Defendant, however, does not explain how merely reporting symptoms as "stable" begs the conclusion that an individual no longer suffers from those depressive symptoms, nor does Defendant explain or offer expert testimony as to what "stabilizing" symptoms means. To the contrary, the 2018 VA records show that Mr. March continued to "report chronic depression symptoms." Ex. 4 at 579.

$11,729,721.78.[22] Mr. March argues that two Connecticut cases should guide the Court's determination of an appropriate non-economic damages award. *See* Pls.' Suppl. Mem.

In *Gagliano v. Advanced Specialty Care*, the plaintiff underwent hernia repair surgery at Danbury Hospital; the surgery was to be performed by her physician, but "[p]rior to the start of the procedure, . . . without the plaintiff's [specific] knowledge, a fourth year [surgical] resident . . . was assigned to assist . . . with the surgery." 329 Conn. 745, 748-49 (2018) (second and third alterations in original). The fourth-year resident informed the physician that he knew how to use a device used in the surgery, called an "optical trocar," but during the surgery, the physician "became concerned that [the resident] was improperly [applying too much force in] using the optical trocar," and "took over for [the resident] and completed the plaintiff's surgery." *Id.* at 749 (second alteration in original). "Two days after the surgery, while recovering in the hospital, the plaintiff began exhibiting signs of infection, and her body went into septic shock," and it was later determined that "the plaintiff's colon had been perforated during the surgery." *Id.* Plaintiff and her husband sued the physician, his practice, the resident, and the hospital for negligence and loss of consortium and, following a settlement with the physician and his practice, the parties proceeded to a jury trial against the resident and the hospital. *Id.* at 749-50.

The trial court found that the plaintiff had suffered life-threatening injuries following the negligently performed procedure. *See Gagliano v. Advanced Specialty Care PC*, No. DBD-CV-106003939, 2014 WL 7333081, at *21 (Conn. Super. Nov. 7, 2014). As the trial court found, the plaintiff's "septic shock . . . triggered multi-organ failures and [she] was subsequently connected to a ventilator," and doctors "expressed concern to the family as to whether the plaintiff would

---

[22] The parties agree that Mr. March's administrative claim was for $15 million, while Mrs. March's administrative claim was for $10 million. *See* Def.'s Resp. to Pls.' Suppl. Mem at 1 nn.1-2.

survive the weekend." *Id.* The plaintiff remained in a coma "for approximately one month" following the surgery. *Id.*

Evidence at trial showed that "the plaintiff's recovery was slow and painful and that she had to relearn basic skills of swallowing, eating, speaking and walking" and she retained "very little muscle coordination"; she also spent "sixty-nine days in the hospital" and was forced to use an "ileostomy bag," which her husband took on the role of emptying following the surgery. *Id.* The plaintiff became "totally reliant on her husband and family to make her meals and help her move" and "endured multiple subsequent surgeries"; she remained "in pain much of the time," had "difficulty being away from the bathroom for any length of time," and was unable to actively care for her grandchildren or travel. *Id.* 21-22. The jury returned a verdict in favor of the plaintiffs and awarded the plaintiff $902,985.04 in economic damages and $9.6 million in noneconomic damages, and her husband $1.5 million in loss of consortium damages. 329 Conn. at 752.

In *Lathan v. Bridgeport Hospital*, "the plaintiff, aged 72, went to the hospital with a urinary tract infection."[23] *Lathan* Summary. She developed a deep vein thrombosis and was prescribed medication; "the resident wrote an order for an overdose, which caused bleeding into the plaintiff's retroperitoneum." *Lathan* Summary at 1. The plaintiff required "emergency surgery, two additional abdominal surgeries, and multiple interventions," and "spent 66 days in the hospital, during which she developed MRSA, osteomyelitis, bed sores, c-difficule, deconditioning and severe distress;" she also developed "a massive incisional hernia at the site of

---

[23] Though Plaintiffs provide their own recitation of the facts in *Lathan*, they cite only to the verdict form in *Lathan*, which does not set forth the facts of the case. Pls.' Suppl. Mem. at 2-3 (citing No. FBTCV106007019, 2013 WL 6019666 (Conn. Super. Oct. 25, 2013)). Accordingly, the Court relies on the Westlaw description of the case provided by Defendant in its response. *See* W. Jordan, 33 No. 12 Verdicts, Settlements & Tactics art. 11 (Dec. 2013), ECF No. 77-1 (filed Jan. 14, 2021) ("*Lathan* Summary").

the surgeries" and became confined to a wheelchair. *Id.* The plaintiff sued the hospital for medical malpractice, and the defendant admitted liability just before trial. *Id.* The jury awarded "$280,000 in past economic damages; $1 million in future economic damages; $5 million in past non-economic damages; and $3 million in future non-economic damages." *Id.*

Plaintiffs "submit these cases as guidance for th[e] Court on [its] assessment of noneconomic damages," also noting that both the *Gagliardo* and *Lathan* plaintiffs were approximately 20 years older than Mr. March at the time of their injuries and that neither claimed a loss of earning capacity. Pls.' Suppl. Mem. at 3.

Defendant argues that these cases do not have "parallel facts" and that awarding damages commensurate with those awarded in these cases would exceed the statutory cap on FTCA damages. Def.'s Resp. to Pls.' Suppl. Mem. at 1.

Defendant argues that Mr. March's case is unlike *Gagliano* because Mr. March did not suffer organ failure or experience a coma or period of immobility following his surgery; did not have to relearn basic skills; was hospitalized for approximately one-third of the time that Ms. Gagliano had been; is more independent that Ms. Gagliano, as he can get out of bed, shower, dress himself, drive, prepare food himself, and do household chores; does not suffer from incontinence or use an ileostomy bag; is capable of performing physical activity; and has less regularly experienced pain. *Id.* at 3-4.

As to *Lathan*, Defendant argues that Mr. March did not experience many of the injuries suffered by that plaintiff, because although Mr. March was diagnosed with MRSA after the laparoscopic ventral hernia repair procedure, he did not experience other injuries like those suffered by the *Lathan* plaintiff nor does he require a wheelchair; Defendant also notes that, like

66

the plaintiff in *Gagliano*, the *Lathan* plaintiff spent a longer period of time in the hospital than did Mr. March. *Id.* at 5-6.

Finally, Defendant argues that it is unclear in both *Gagliano* and *Lathan* what portion of the awarded damages was based on medical costs versus loss of future earnings, and argues that if the Court applies a multiple of economic damages to determine noneconomic damages, it should apply the multiple only to the medical costs rather than to the aggregate economic amount. *Id.* at 6 n.8. As a result, Defendant argues that a significantly lesser noneconomic damages amount than that awarded in *Gagliano* and *Lathan* is warranted on the facts here.

Though the Court will award noneconomic damages to Mr. March, the Court disagrees with the over $11 million figure proposed by Plaintiffs.

Though Mr. March has undoubtedly suffered significant pain and suffering, as discussed above, which warrants noneconomic damages, the Court agrees with Defendant that the evidence on the record shows that Mr. March appears better able to care for himself, and maintains a degree of self-sufficiency, greater than the plaintiffs in *Gagliano*, *Lathan* and *Munn*. *See Gagliano*, 2014 WL 7333081, at *1-2 (plaintiff suffered multi-organ failure, was "totally reliant" on her husband, was unable to walk more than a quarter of a mile, used an ileostomy bag, and had difficulty being away from the bathroom for a period of time, as well as had to relearn basic skills); *Lathan* Summary at 1 (plaintiff was confined to a wheelchair); *Munn*, 24 F. Supp. 3d at 163 (plaintiff "lost the ability to speak," retained "little control over her facial muscles," and suffered significant "cognitive defects that slow her ability to think through complex problems").

Indeed, as discussed above, Mr. March remains able to drive, prepare food, go grocery shopping, dress himself, complete some household chores, and shower independently, though he experiences some difficulty in completing these tasks. *See* Tr. 320:7-321:3 (Mr. March)

(describing the process by which he gets out of bed and gets dressed); *id.* 321:4-9 (stating he can

get into one of his bathtubs or showers, but not the higher bathtub in his bedroom); *id.* 321:12-23

(describing how he likes to grocery shop to "get out of the house"); *id.* 319:14-18 (stating he

cannot cook a dinner but can prepare basic meals for himself); *id.* 319:19-21 (confirming he can

vacuum); *id.* 319:25-320:6 (stating he can wash windows but does not because it "requires a lot

of time on [his] feet and standing," which "applies pressure" to his body); *id.* 292:2-12 (he is

"comfortable driving to an extent").

In addition, though Mr. March testified that "everything is a chore," *id.* 321:1-3; that

while moving, he fears "falling" and has difficulty "traversing different elevations of landscape,"

*id.* 322:10-24; that he feels "nauseous from time to time" when moving, particularly when

getting out of bed, *id.* 320:12-24; that he "walk[s] slow[ly] now," *id.* 323:11-20; and that after

periods of activity his "body is tired," *id.* 321:15-23, there is no evidence on the record that Mr.

March is unable to move or restricted in his movements to a degree as significant as the plaintiffs

as discussed above. In fact, Mr. March testified that his physicians have encouraged Mr. March

to "keep moving." *id.* 323:11-20.

Similarly, though Mr. March testified that he feels "hopeless," *id.* 323:24-324:3; "less

and less motivated" each year, *id.* 323:11-20; that he is "constantly battling with [him]self and

[his] insecurities," *id.* 291:12-292:1; and that he feels as though he has "let . . . down" his family

given his lowered ability to "participate [in] and help them in areas that [he] normally would be

able to," *id.* 319:1-9, all of which constitutes pain and suffering warranting a noneconomic

damages award, there is no indication that this rises to the level of, as an example, the distress

suffered by the plaintiff in *Munn. See* 24 F. Supp. 3d at 209-10 (discussing the "perfect storm of

symptoms that, taken together, magnify [Ms. Munn's] individual deficits into a debilitating and

humiliating disability" which led to the plaintiff "contemplate[ing] suicide," with experts predicting she would "again crash into a deep depression" in the future).

These comparisons, however, should not be construed as diminishing Mr. March's suffering. As the Court observed firsthand at trial, and the record makes clear, Mr. March has experienced significant physical, psychological, and emotional harm. The Court nevertheless must determine whether Mr. March's injuries fall into a "similar constellation" of other cases that may offer guidance, particularly given the "subjective nature of a non-damages inquiry" that requires the Court to "evaluat[e] the totality of the harms [the plaintiff] suffers." *Id.* at 213. And though Mr. March's injuries do not rise to the level of severity in those cases, the evidence does show that, following the laparoscopic ventral hernia repair procedure, Mr. March "did not return to the state of health [he] was in prior to the surgery and that [his] life's activities were dramatically impacted." *Gagliano*, 2020 WL 7333081, at *22. Finally, the fact that Mr. March has requested economic damages in the form of cost of future care and lost earnings in addition to already-incurred medical costs also weighs in favor of applying a lower multiplier than in *Gagliano* or *Lathan*, neither of which appear to have expressly contemplated or quantified future earnings potential in their damages calculations. *See Gagliano*, 2020 WL 7333081, at *1 (noting that the jury had awarded noneconomic damages but failing to specify the basis for that award); *Lathan* Summary at 1 (same); *but see* Pls. Cara Munn, et al.'s Closing Statement, *Munn v. Hotchkiss Sch.*, No. 3:09-cv-919 (SRU), 2013 WL 8539242 (Mar. 26, 2013) (discussing the future earnings estimate included as part of Ms. Munn's economic damages claim); *Munn*, 24 F. Supp. 3d at 163-64 (noting the Munns were awarded $10.25 million in economic damages and $31.5 million in noneconomic damages, or a three-times multiplier).

Accordingly, having weighed all of the relevant factors, the Court will award Mr. March $5,000,000 in noneconomic damages, an amount slightly more than 1.5 times his economic damages award.

### iii.   Mrs. March's Loss of Consortium Claim

### 1.   Standard of Review

Loss of consortium is generally defined as "the loss of services, financial support, and the variety of intangible relations that exist between spouses living together in marriage." *Bye v. Cianbro Corp.*, 951 F. Supp. 2d 322, 330 (D. Conn. 2013) (quoting *Greci v. Parks*, 117 Conn. App. 658, 675 (2009)). "[T]he mental and emotional anguish caused by seeing a healthy, loving[,] companionable mate turn into a shell of a person is undeniably a real injury," and "an injury to one's spouse may turn a happily married man or wom[a]n into a lifelong nurse and deprive him or her an opportunity of having children and of raising a family." *Hopson v. St. Mary's Hosp.*, 176 Conn. 485, 493 (1979).

"[E]ither spouse has a claim for loss of consortium shown to arise from a personal injury to the other spouse caused by the negligence of a third [party]." *Id.* at 496. "Loss of consortium is a derivative cause of action, meaning that it is dependent on the legal existence of the predicate action." *Musorofiti v. Vlcek*, 65 Conn. App. 365, 375 (2001); *see also Izzo v. Colonial Penn Ins. Co.*, 203 Conn. 305, 312 (1987) ("We recognized in *Hopson* that although loss of consortium is a separate cause of action, it is an action which is derivative of the injured spouse's cause of action." (internal quotation marks and alterations omitted)).

As to the damages that may result in a loss of consortium claim, the Connecticut Supreme Court has observed that "[t]he task of computing damages for a loss of consortium is no more difficult for a judge or jury than arriving at an award for pain and suffering," but "[t]he difficulty

of assessing damages for loss of consortium is not a proper reason for denying the existence of

such a cause of action inasmuch as the logic of that reasoning would also hold a jury

incompetent to award damages for pain and suffering," *Hopson*, 176 Conn. at 493-94 (internal

quotation marks and alterations omitted). Indeed, while "the different types of damages never

have been uniformly defined" in Connecticut, "[i]n *Hopson*, [the Connecticut Supreme Court]

. . . recognized that recovery is possible both for loss of the household services performed by the

impaired spouse and for the various 'intangible' or 'sentimental' blessings of marriage, including

sexual relations, affection, society, companionship, and moral support." *Ashmore v. Hartford

Hosp.*, 331 Conn. 777, 793-94 (2019).

The Connecticut Supreme Court has consistently avoided "attempt[ing] either to catalog

or to clearly define the range of potential loss of consortium damages." *Id.* at 794; *see also id.* at

798 ("[W]e recognize that loss of consortium damages, by their nature, defy any precise

mathematical computation."). The Connecticut Supreme Court has adopted the general

presumption, however, that loss of consortium damages should be considered alongside

"noneconomic damages awarded to the injured spouse" and, if the former are "substantially

greater" than the latter, "a suspicion naturally arises that the loss of consortium award was the

product of sympathy or partiality toward the deprived spouse or prejudice against the defendant."

*Id.* at 798-99; *see also id.* ("[A]n award of noneconomic damages to the impaired spouse,

awarded at the same time, by the same finder of fact, provides a natural and meaningful

benchmark by which we may evaluate the reasonableness of the corresponding loss of

consortium award."); *Musorofiti*, 65 Conn. App. at 376 ("[T]he derivative spouse may not

recover more than the injured spouse."). "To uphold such an award, a reviewing court must be

able to point to evidence that explains or justifies the unusual disparity." *Ashmore*, 331 Conn. at 799.

### 2. Discussion

The Court analyzes Mrs. March's loss of consortium claim under the framework proposed by *Ashmore*, "broadly segment[ing]" the analysis into "household services and the more intangible and sentimental aspects of a marriage." *Id.*

With respect to household services, Mrs. March testified that she needed to "run the household," and "take care of the house, the kids, [and] him." Tr. 346:21-347:10. She testified that some days, Mr. March "doesn't need [her] all of the time," but other days "he's stuck in bed for hours or days and [she] ha[s] to be around to help him." *Id.* She testified that on some days, she has to "help him into the shower . . . because he has to take the binder off for the shower, his balance issues." *Id.* 352:4-13. She testified that she "make[s] all three meals, do the stuff with the kids, do the household chores." *Id.* 352:13-15. She testified that she was frustrated because of the additional chores she had to take on after the surgery, particularly the "outdoor chores." *Id.* 352:18-21. She also testified that at the time of Mr. March's surgery, she was doing part-time work at Victory Energy Services, and that she went back to work in October of 2015, and worked until April of 2016. *Id.* 346:3-20. She testified that she had not returned to work because although she had "looked for jobs . . . at home," she "didn't find anything," and "mostly it is somebody has to take care of him," and she "ha[s] to be around to help him." *Id.* 346:21-347:8.

For his part, Mr. March testified that before the surgery, he "took care of the yard," "cleaned out gutters," and "fixed everything in the house." *Id.* 317:11-16. He also testified that he did "snowblowing, raking, vehicles, [and] oil changes," but noted that those chores were done now either by someone he paid, or by his "kids," but he did not mention those being done by

Mrs. March. *Id.* 318:1-12. He testified that he is not able to cook dinner or do laundry, but that he could vacuum and wash windows, *id.* 319:10-320:6. He also testified that he is able to go and pick up groceries. *Id.* 321:14-23.

With respect to the more intangible and sentimental aspects of a marriage, Mrs. March testified that "the whole world got turned upside down compared from what we used to be to where we are now." *Id.* 348:6-11. She testified that before, she was "treated like a princess, in a sense," but "now [was] like a nursemaid." *Id.* 348:11-19. She testified that she "[doesn't] feel like a wife," and "resent[s] him," then "feel[s] guilty when [she] resent[s] him." *Id.* 348:20-22. She testified that the feeling was "overwhelming," and that she had gained weight and lost motivation and self-esteem since Mr. March's surgery. *Id.* 350:5-351:6. With respect to their physical relationship, she testified that since the surgery, there had been a "[c]omplete loss of physical relationship," *id.* 348:11-12, and that since June of 2015, she and Mr. March had attempted to have a physical relationship, but were not able to, *id.* 351:11-19.

Mr. March also testified that their marriage had become a "[c]onstant challenge, where he "take[s] things out on her," "end[s] up becoming grouchy to her," and that the "family's whole schedule revolves around [him]." *Id.* 291:14-19. He testified that his family generally doesn't allow him to be home alone. *Id.* 292:13-23.

Mrs. March has sufficiently proved her loss of consortium claim. Though Defendant argues that the evidence does not show that Mr. March cannot be left home alone or that the division of labor before and after the laparoscopic ventral hernia repair procedure remained the same, such that Mrs. March "continues to do the same tasks she did previously," *see* Def.'s Post-Trial Findings at 83 ¶ 10, the Court disagrees.

73

Mrs. March's testimony specifically referred to additional chores she needed to take on after the procedure, as well as the additional time she needed to spend caring for Mr. March, such as helping him into the shower and tending to him on days when he is unable to make himself meals or get out of bed. The Court agrees with Defendant, however, that with respect to tasks such as "snowblowing, raking, vehicles, [and] oil changes," *see* Tr. 318:2-4, which Mr. March may have done before the surgery, Mrs. March has not proven that she has taken on these additional tasks. *See* Def.'s Post-Trial Findings at 83 ¶ 10.

Defendant's primary argument as to the intangible, or sentimental, aspects of marriage is that there was "little specific evidence with respect to how, if at all, Mr. March provided Mrs. March with emotional consortium before his surgery." *Id.* Defendant also argues that Mrs. March's claim is not comparable to that in *Gagliano*, where the plaintiff's husband was awarded $1.5 million in damages for loss of consortium, because "[t]here is no evidence that Mrs. March stayed at the hospital with Mr. March, nor that she physically checked on him every 15 minutes," nor did she "live for a month with the uncertain future that Mrs. Gagliano's husband did." Def.'s Resp. to Pls.' Suppl. Mem. at 4 (citing *Gagliano*, 2014 WL 7333081, at *1).

The Court disagrees.

As discussed above, Mrs. March's testimony repeatedly referred to the effect that the surgery had on her marriage, including a "complete loss of physical relationship," Tr. 348:11-12; that she had gained weight and lost motivation, *id.* 348:7-8; that she felt she had been reduced to a "nursemaid," when before, she was "treated like a princess," *id.* 348:14-19; and that "the whole world [had been] turned upside down compared form what we used to be to where we are now," *id.* 348:9-11. She also testified credibly that her life had become "very unpredictable" given Mr. March's difficulties, *id.* 347:21-348:2; that it felt "overwhelming," *id.* 350:5-9; and that she felt

74

"really bad about herself and useless" as a wife to Mr. March, *id.* 351:2-6. This testimony sufficiently shows a loss of "the variety of intangible relations that exist between spouses living together in marriage," specifically the decline in the Marches' physical and emotional relationship, about which both Mr. and Mrs. March credibly testified.

Accordingly, having weighed all of the relevant factors, including but not limited to the relationship between Mr. March's noneconomic damages award and any potential award to Mrs. March, along with the impact of Mr. March's considerable physical and emotional injuries on her relationship with him, as well as their relative youth, the Court awards Mrs. March $1,200,000 in damages for loss of consortium. This amount, while significant generally, cannot adequately compensate Mrs. March – indeed no amount can – for what she has lost in this relationship, and will continue to lose, as the years go by.

## VI.     CONCLUSION

For the reasons discussed above, the Court **ORDERS** judgment in favor of Plaintiffs and **AWARDS $3,270,278.22** in economic damages to Mr. March; **$5,000,000** in noneconomic damages to Mr. March; and **$1,200,000** in damages for loss of consortium to Mrs. March, for a total award of **$9,470,278.22**.

The Court also **DENIES** Defendant's motion *in limine*.

The Clerk of the Court is directed to enter Judgment for Plaintiffs and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 5th day of March, 2021.

    /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE